**ALOHA AIRLINES, INC., Plaintiff-Appellee,**

v.

**HAWAIIAN AIRLINES, INC., Defendant-Appellant.**

No. 73–1557.

United States Court of Appeals, Ninth Circuit.

Nov. 29, 1973.

Rehearing Denied Jan. 29, 1974.

Joseph M. Alioto, San Francisco, Cal. (argued), for defendant-appellant.

Maxwell M. Blecher, Los Angeles, Cal., for plaintiff-appellee.

Before TUTTLE, * HUFSTEDLER and KILKENNY, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal from an interlocutory order denying the defendant-appellant's motion to dismiss D.C., 349 F.Supp. 1064, is here by order of this court allowing interlocutory appeal under 28 U. S.C.A. § 1292(b).

The issue is a narrow one, but one that is important and timely for interlocutory consideration because of the decision of the Supreme Court in Hughes Tool Company v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L. Ed.2d 577 (1973).

The significance of the *Hughes* case here is plain when we note that this, like *Hughes*, is a case of alleged antitrust violations of section 2 of the Sherman Act, 15 U.S.C.A. § 2, which alleged violations had previously been the subject of certain proceedings before the Civil Aeronautics Board. In *Hughes* the Court, reversing the decision of the Court of Appeals for the Second Circuit, 332 F.2d 602 (2d Cir. 1964), held that the principal acts alleged as the grounds of an antitrust suit had all been the subject of express orders approving them, previously entered by the CAB in the proper exercise of its statutory duties, and that, therefore, all of these acts, as well as other conduct which "was no more than the kind of conduct the CAB . . . had approved" were immunized from antitrust laws. We must, therefore, determine whether the acts of HAL which Aloha alleged as the basis of its antitrust suit and the actions of the CAB relative to them here fit the pattern of those found by the Court in *Hughes* to immunize them from the antitrust laws.

The following undisputed history of the case is taken largely from the decision of the trial court, preliminary to its order denying HAL's motion to dismiss:

Aloha and defendant HAL are both air carriers incorporated in the State of Hawaii. By virtue of certificates of public convenience and necessity issued to them by the Civil Aeronautics Board, they provide nearly all air transportation of persons, property and mail among the several islands of the State of Hawaii.

In the original complaint of July 3, 1972, plaintiff alleged that defendant, beginning as early as 1968 and continuing through 1970, engaged in an attempt

---

* Of the Fifth Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

to monopolize this inter-island air transportation system in violation of section 2 of the Sherman Act, 15 U.S.C.A. § 2. Plaintiff listed seven acts which defendant allegedly undertook "with the predatory intent and purpose of eliminating plaintiff as a viable competitor" and "with full knowledge of its impact on plaintiff and with the intent of injuring or destroying plaintiff." These are: (1) excessive (vis a vis the needs of the public) flight schedules; (2) excessive purchasing, ordering, leasing (or agreeing to lease) of aircraft; (3) misrepresenting its schedules to the public; (4) providing below cost servicing to interstate air carriers between stops; (5 & 6) publicizing the fact that plaintiff and defendant should merge, while twice in bad faith renouncing merger agreements into which defendant had entered; and (7) opposing before the CAB plaintiff's request for a subsidy. As a result of these alleged practices, plaintiff claims it was damaged in the amount of $7,700,000 and prays for treble damages under section 4 of the Clayton Act, 15 U.S.C.A. § 15.

Pursuant to Fed.R.Civ.P. 12(c), defendant moved for an order dismissing plaintiff's complaint on the grounds that (1) it fails to state a claim upon which relief can be granted and/or (2) the trial court lacked jurisdiction over the subject matter and parties. Alternatively, on the same basis, defendant moved under Fed.R.Civ.P. 56 for an order of summary judgment as to all the claims alleged in the complaint.

Defendant's motions were based on four contentions. First, the CAB has exclusive jurisdiction over the subject matter of this action. Second, the CAB

has primary jurisdiction and the Court should await further proceedings by the Board. Third, plaintiff's complaint fails to allege the necessary elements for an attempt to monopolize which is prohibited by section 2 of the Sherman Act. Fourth, Eastern Railroad Conference v. Noerr Motor Freight, 365 U.S. 127, 81 S. Ct. 523, 5 L.Ed.2d 464 (1961) forbids any antitrust claim based on defendant's opposition to Aloha's subsidy request before the CAB.

The trial court found none of HAL's arguments convincing and denied the motion to dismiss. Subsequently, the Supreme Court decided the *Hughes* case, and HAL renewed its motions, which were again denied. This Court granted interlocutory appeal. We affirm.

The position of HAL urged upon the trial court is essentially that all of the *actions alleged in the complaint deal* with problems that are within the exclusive authority of the CAB, and, therefore, the trial court was precluded from exercising its normal antitrust jurisdiction. In effect, the argument runs that since section 411 of the Federal Aviation Act, 49 U.S.C.A. § 1381,[1] gives to the CAB power and authority to investigate "unfair or deceptive practices or *unfair methods of competition* in air transportation," (Emphasis added) this is an explicit commitment to the CAB of sole jurisdiction to deal with any such acts as may be charged to air carriers. They, of course, point to no provision of the statute which expressly immunizes such conduct from charges of Sherman Act violation.

To the contrary, there is a section of the Act, section 414, 49 U.S.C.A. § 1384,[2] which does immunize certain ac-

1. "The Board may, upon its own initiative or upon complaint by *any air carrier, foreign air carrier, or ticket agent,* if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier, foreign air carrier, or ticket agent has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof. If the Board shall find, after notice and hearing, that such air carrier,

foreign air carrier, or ticket agent is engaged in such unfair or deceptive practices or unfair methods of competition, it shall order such air carrier, foreign air carrier, or ticket agent to cease and desist from such practices or methods of competition. Pub.L. 85-726, Title IV, § 411, Aug. 23, 1958, 72 Stat."

2. "Any person affected by any order made under sections 1378, 1379, or 1382 of this ti-

tions *authorized, approved* or *required* by other sections of the Act from the antitrust laws.

There is nothing in the *Hughes* opinion that modifies the established rule enunciated in the *Hughes* case when decided in the Court of Appeals that:

"The proposition has so often been stated that it has become hornbook law that immunity from the operation of the antitrust laws is not lightly to be inferred from the enactment of a regulatory statute, see Georgia v. Pennsylvania R. Co., 324 U.S. 439 [65 S.Ct. 716, 89 L.Ed. 1051]." 332 F.2d 602, 606.

In fact the author of the Court's opinion in *Hughes* while writing for the Court earlier, stressed the fact that only those matters "normally thought of as antitrust *problems*" (Emphasis added) that are "expressly entrusted to the CAB are withdrawn from consideration by the Courts." See Pan American World Airways, Inc. v. United States, 371 U.S. 296 at 304, 305, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963).

The jurisprudence, therefore, seems to have been, prior to the Court's decision in *Hughes*, that in those areas of air carrier operations as to which the CAB was given autonomy to issue *orders* dealing with the certification, supervision of tariffs, mergers, borrowings, and interlocking interests of air carriers, the CAB had exclusive jurisdiction to the extent that the courts would not second guess what the Board in its expertise had authorized by order. For example, if the CAB granted a certificate to carrier A for service between two terminal points, a competing carrier could not bring an antitrust charge against carrier A that the mere granting of the certificate and the competition flowing from it was in violation of the antitrust laws, no matter how the new carrier was

motivated or how destructive its competition. Such conduct was immunized from "antitrust" action by section 414, *supra*, 49 U.S.C.A. § 1384.

Moreover, the Supreme Court had held that the Board's jurisdiction under section 411 to investigate and put an end to unfair practices alleged to have resulted from orders lawfully entered under authority of sections 408 and 409 gave the CAB exclusive jurisdiction to put a stop to such conduct. The Court said in Pan American World Airways v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L. Ed.2d 325:

"It seems to us, therefore, that the Act leaves to the Board under § 411 all questions of *injunctive relief* against the division of territories or the allocation of routes or against combinations between common carriers and air carriers." (footnote omitted) (Emphasis added). 371 U.S. at 310, 83 S.Ct. at 485.

In the *Hughes* case, Trans World Airlines had filed an antitrust suit against Hughes Tool Company. A default judgment of $145,000,000 with 7½% interest was affirmed by the Court of Appeals for the Second Circuit. 449 F.2d 51 (1971). As stated by the Court in its opinion "The crux of TWA's complaint was the use by Toolco of its control over TWA to control and dictate the manner and method by which TWA acquired aircraft and the necessary financing thereof." 409 U.S. 366, 93 S.Ct. 650.

The Court then stated the issue:

"Another defense of Toolco was that those transactions were under the control and surveillance of the Civil Aeronautics Board and by virtue of the Federal Aviation Act of 1958 these transactions have immunity from the antitrust laws.

"It is our view that the Court of Appeals erroneously rejected that de-

tle shall be, and is hereby, relieved from the operations of the 'antitrust laws,' as designated in section 12 of Title 15, and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as

may be necessary to enable such person to do anything authorized, approved, or required by such order. Pub.L. 85–726, Title IV, § 414, Aug. 23, 1958, 72 Stat. 770."

fense. This result, we think, is required by sections 408 and 414 of the Federal Aviation Act and by our prior decision in Pan American World Airways v. United States, 371 U.S. 296 [83 S.Ct. 476, 9 L.Ed.2d 325] (1963)."

The Court's opinion then recited the facts that had occurred during the period 1944–1960: Toolco had by 1944 obtained practical control of TWA by acquiring 45%10% of the outstanding stock of the airline; it had obtained subsequent authorizations, including Board approval of the acquisition of up to 80% of the TWA stock by Toolco in 1950. During this time many purchases and financial arrangements were expressly authorized by the Board under section 408. The Court stressed the fact that each of these Board orders was subject to the requirement contained in the original order of the Board that specific orders of the Board would be required with respect to each transaction dealing with the acquisition of additional aircraft and the financing thereof. Following the placing by Toolco of the stock in a voting trust in 1950, at the insistence of the financial institutions involved in the program, TWA, now no longer under the control of Toolco, filed suit against the latter alleging violations of the antitrust laws, which violations the Supreme Court describes as follows:

"As analyzed by the Court of Appeals in its opinions filed in this case, the complaint rested principally on Toolco's conduct as controlling stockholder during the years 1955–1960 . . .

"As respects its defense that CAB control and surveillance gave it immunity from the antitrust suit, Toolco relies on Pan American World Airways v. United States, 371 U.S. 296 [83 S.Ct. 476, 9 L.Ed.2d 325]. The Court of Appeals distinguished that case, saying that there the unlawful division of territories and allocation of routes were directly 'within the ambit of powers explicitly granted the Board by the Congress,' 332 F.2d at 608. The Court of Appeals said that the present case was different be-

cause, in its view, the continuing supervision of the Board over the Toolco-TWA relationship was general and not related to a specific conduct that gave rise to violations of the antitrust laws." *Id.* at 372–378, 93 S.Ct. at 656.

The Court then made it plain that the facts in *Hughes* were not to be distinguished from those in *Pan American* so far as their being matters that were explicitly committed to the CAB was concerned. The Court said:

"One difficulty with the conclusion of the Court of Appeals that these transactions, unlike those involved in the *Pan American* case, were transactions on which the Board might take action but did not do so, is that it misconstrues the record. As noted, from 1944 through 1960 every acquisition or lease of aircraft by TWA from Toolco and each financing of TWA by Toolco required Board approval. Each transaction was approved by the Board and each approval was an order under section 408, for the Board regarded its transactional orders as modifications or interpretations of its antecedent control order. Each of the modification orders recited the finding of the Board that the transactions were 'just and reasonable and in the public interest.'" *Id.* at 379, 93 S.Ct. at 657.

The Court then for the second time stated that the Federal Aviation Act does not completely displace the antitrust laws. The Court said "We by no means hold that the Federal Aviation Act completely displaces the antitrust laws. Pan American, 371 U.S. at 305 [83 S.Ct. 476]." The Court then, it seems to us made clear the thrust of its holdings as to the extent to which the antitrust laws were displaced in the circumstances of that case.

"But where, as here, the CAB authorizes control of an air carrier to be acquired by another person or corporation, and where the CAB specifically authorizes as in the public interest specific transactions between the par-

ent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of CAB, not in the hands of those who can invoke the sanctions of the antitrust laws. As noted, the parent company which controls an air carrier is subject to pervasive control by the CAB. The control which CAB is authorized to grant or to deny under. § 408 involves an appraisal of the impact of that control in terms of monopoly and competition; and the ongoing supervision entrusted to the CAB by § 415 is broad enough to put all transactions between parent and subsidiary—as originally conceived or subsequently exercised—under CAB supervision." *Id.* at 387–388, 93 S.Ct. at 662.

In the case before us there is no order of the CAB authorizing the conduct which has been made the basis of the antitrust complaint filed by Aloha. HAL takes the position, however, that the fact that section 411 of the Act provides that the Board may, upon its own initiative or upon complaint by any air carrier, investigate and determine whether any air carrier has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation and if it should find the existence of such practices, it shall issue a cease and desist order amounts to an explicit commitment of exclusive authority to the Board to deal in all aspects with charges of unfair competition.

To be sure, *Pan American* held that the CAB had exclusive jurisdiction to halt certain alleged anticompetitive practices, but the alleged practices in that case had been the subject of specific orders of the CAB dealing with "the division of territories or the allocation of routes or  . . .  combinations between common carriers and air carriers" —all matters within the Board's pri-

mary jurisdiction under section 408 or section 409. In contrast, the CAB has not issued any orders authorizing or restraining HAL's past conduct of which Aloha complains.

The Court made it plain in *Pan American* that such jurisdiction was restricted to prospective relief since the Court said "[t]he Board has no power to award damages or to bring criminal prosecutions." This was noted at the point in which the Court was recognizing limitation on the kinds of relief that were committed to the Board. The dissenting opinion by Mr. Justice Brennan was based largely upon the distinction made by the Court between the granting of exclusive jurisdiction to the Board as to injunctive matters while leaving to the antitrust court the handling of damage claims.

■ We conclude, therefore, that the grant of authority to the Board by section 411 does not withdraw from the antitrust litigants the right to proceed for damages alleged to have occurred by reason of antitrust violations of the kind with which the Board has authority to deal only by issuing a cease and desist order.

HAL has a further prong to its attack on the judgment of the trial court. It says that the same issue now before the antitrust court has already been litigated and resolved partially in favor of Aloha and partially against it. This contention is based upon the fact that on September 16, 1968, Aloha filed a petition with the CAB seeking subsidies for the period *beginning on that date* because it apprehended a continuation of already existing alleged unfair competitive practices by Hawaiian—principally excessive uneconomical overscheduling of flights. Such a subsidy procedure is authorized under 49 U.S.C.A. § 1376(a) and (b).[3]

---

3. Subparagraph (b) dealing with "rate-making elements" provides as follows:

"(b) In fixing and determining fair and reasonable rates of compensation under this section, the Board, considering the

conditions peculiar to transportation by aircraft and to the particular air carrier or class of air carriers, may fix different rates for different air carriers or classes of air carriers, and different classes of

The petitioner requested a subsidy award of $1,784,784.00 for the year beginning September 16, 1968, and a like amount for each year thereafter. Thereafter Hawaiian Airlines filed a similar petition on October 7, 1968. In its presentation to the CAB Aloha alleged that HAL had engaged in uneconomic scheduling practices throughout 1968 and 1969. On May 16, 1972, the CAB awarded Aloha a subsidy of $789,000.00 for losses which it sustained during the period September 16, 1968, through February 29, 1969. This subsidy was awarded on the finding that for the five and one-half month period Aloha's losses were due to " . . . the uneconomic competition of Hawaiian [Airlines]." As to the rest of the period for which Aloha's claim for subsidies was being considered by the Board it was decided that "Quite apart from the wisdom or unwisdom of Aloha's action from a competitive standpoint, it was clearly not 'economical and efficient' within the meaning of the first standard of the Act." The Board, in its opinion stressed the fact "[t]hat the standards for the award of subsidy are somewhat more stringent than the standards governing generally the sound management of a carrier has long been clear," citing Transatlantic Final Mail Rate case, 19 CAB 464, 520 (1954).

The contention by HAL as to this subsidy is two-fold. In the first place it claims that Aloha has received compensation for any actions that would normally be considered as relevant to an antitrust suit arising from excessive scheduling of flights when it received the subsidy award for the five and one-half month period. In the second place it contends that the provisions for subsidy awards is an adequate substitute for the failure elsewhere in the Act to provide for the awarding of damages for conduct that would normally justify the bringing of an antitrust complaint.

The treatment of this claim by the Board in this case, together with a careful reading of the Act itself, makes it plain that the awarding of a subsidy is in no sense intended to compensate one competing carrier for losses inflicted upon it by unfair trade practices committed by another. The subsidy provisions are merely a stopgap to assist a carrier, whose continued existence is recognized to be in the public interest by the Board, to keep its head above water so long as its failure to do so is not the result of its own dishonest, uneconomical or inefficient management. It is to be noted that it has nothing to do with the reimbursement of lost profits which might otherwise have been legally earned by the injured carrier which, under the antitrust laws is not held to the strict accountability of stringent economy and competence of management required of applicants for subsidies.

In the case before the Board it not only disallowed a substantial amount of the requested subsidy representing items which may very well normally have been includable in the operating expenses of a plaintiff in an antitrust damage suit,[4] but the Board itself drew attention to

service. In determining the rate in each case, the Board shall take into consideration, among other factors, (1) the condition that such air carriers may hold and operate under certificates authorizing the carriage of mail only by providing necessary and adequate facilities and service for the transportation of mail; (2) such standards respecting the character and quality of service to be rendered by air carriers as may be prescribed by or pursuant to law; and (3) the need of each such air carrier (other than a supplemental air carrier) for compensation for the transportation of mail sufficient to insure the performance of such service, and together with all other revenue of the air carrier, to enable such air carrier under honest, economical, and efficient management, to maintain and continue the development of air transporation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense."

4. Two items of expense claimed by the carrier but disallowed by the Board were "promotion and sales expenses" of $177,133.00 and a write-off of $44,976 for a Viscount aircraft after a ground accident.

the fact that the standards for the award of subsidy are somewhat more stringent than the standards governing generally the sound management of a carrier. The Board said in the Transatlantic Final Mail Rate case, *supra:*

"We are of the firm conviction that every carrier which requires subsidy support must make its management decisions after careful consideration of the effect they will have on the carrier's subsidy requirements. Factors of airline prestige or competitive advantage which may be of primary concern in management decisions in other industries must give way to the effect on required subsidy where the government is called upon to furnish a substantial portion of the total costs of operation."

So, too, the Court of Appeals for the District of Columbia Circuit said in Trans World Airlines, Inc. v. Civil Aeronautics Board, 128 U.S.App.D.C. 126, 385 F.2d 648 at 657, cert. denied, 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968):

"A subsidy agency may realistically stress diligence to avoid excessive advertising and selling expense since restraints that normally operate on corporate management may be subdued in the case of a subsidized operation, where the managers may be influenced by the possibility if not the prospect that current subsidized advertising expenditures would attract customers who would remain, in good measure, as patrons in the later subsidy free period. The danger of spiralling selling costs is manifest where subsidies are payable to carriers who compete with each other."

■ Under Aloha's certificate to operate in the State of Hawaii it would, in fact, be remiss if it did not apply for a subsidy to see it through a period of such losses as would threaten its viability as a carrier. Since such subsidies are measured by the amount which is necessary when added to "all other revenue of the air carrier . . . to maintain

air transportation to the extent and of the character and quality required for the commerce of the United States, the Postal Service, and the national defense," it is clear that such subsidy is no measure of anticipated profits which might be recoverable in an antitrust action. Neither, therefore, can the provision of subsidies be considered as a substitute for damages that may be owed to a carrier either for the period of the subsidy itself or the presubsidy or post subsidy periods included within an antitrust action.

■ Little need be said of the other argument of HAL to the effect that the filing of a petition by Aloha against HAL under section 411 complaining of the same overscheduling and other conduct by HAL was either a binding recognition by Aloha that the CAB had exclusive jurisdiction over the matters there at issue or that it amounted to an election of remedies which would bar a subsequent action for damages in the antitrust court. As has already been indicated, there is no way in which the CAB can award damages for Sherman Act violations. To the extent that the Supreme Court has recognized that certain problems dealing with prospective conduct are exclusively confined to the CAB by section 411, the recognition of such jurisdiction does not exclude the right of a complaining carrier to resort to the courts in matters which do not fall within such jurisdiction. A claim for past damages is such a matter. In this case the complaint alleges damages from a conspiracy beginning in 1968 and running through 1970, after which time the parties had made an agreement with respect to scheduling that caused a dismissal of the section 411 complaint filed by Aloha and a counter-complaint filed by HAL. It is apparent that the parties concluded that they had obtained all that they could reasonably hope to get before the Board under a section 411 type hearing when they agreed by stipulation to a reduction in the overscheduling complained of by Aloha and bound themselves by stipulation to a scheduling pro-

gram to be effective until July, 1973. Aloha could not, and does not now, contend that the overscheduling practices of the earlier period continued beyond the effective date of the new agreement. It does not claim damages in the antitrust suit for any conduct subsequent to December 31, 1970. We conclude, therefore, that the commencement and termination of the section 411 proceedings do not bar an antitrust action seeking damages only for conduct alleged to continue from 1968 through 1970, merely because this overscheduling produced a subsidy for part of the period for Aloha and resulted in a compromise solution for the future scheduling of the two airlines in a section 411 proceeding.

We still have for consideration the contention by HAL that even though the CAB may not have had exclusive jurisdiction over all matters dealing with the actions alleged by it as a basis for its antitrust action, it nevertheless had primary jurisdiction. As stated in appellant's brief, "[a]t the very least, the antitrust action in the district court below must be stayed pending exercise by the CAB of its primary jurisdiction to resolve Aloha's claims of unfair competition."

In light of the proceedings that have already been held by the CAB in the subsidy matter and the section 411 hearings, it is difficult to understand precisely what the appellant considers should now be remanded to the Board for further consideration before the unfair competition claims are ripe for court action. It is significant that there is not now, nor has there ever been, any authority in the Board under section 411 or elsewhere to make a factual determination as to the existence *vel non* of all the ingredients of an antitrust suit under the Sherman Act. While there are questions of the application of the doctrine of collateral estoppel to be resolved by the trial court when it considers what effect is to be given to the determinations made by the CAB in the subsidy proceedings that there was uneconomical scheduling by HAL causing the

right to a subsidy by Aloha, the elements to be proved as to the existence of Sherman Act violations would under no circumstances be a matter for the Board to decide. It is difficult, therefore, to see how the court should defer to the Board to permit the parties to seek findings of fact there which would not obviate the necessity for the antitrust court to litigate other issues.

As pointed out by the Supreme Court in *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), the court should stay an antitrust action for prior administrative proceedings under the doctrine of primary jurisdiction if is is likely that a prior agency adjudication of the matters before it will be a material aid to the court in disposing of the antitrust suit. *See* 409 U.S. at 304, 305, 93 S.Ct. 573. In the case before us, it appears that the CAB has done its full task with respect to the matters that are now being urged in the antitrust action. It was requested to, and it did, grant a subsidy for conduct occurring during a period of five and one-half months midway between the start and the conclusion of the alleged antitrust conspiracy, based upon "uneconomical scheduling." It is to be noted that this is all that it need find in order to grant subsidy. It was not requested to, and it did not, find the other ingredients present which would be required in the bringing of an antitrust action. It also held hearings under the section 411 proceedings until the parties, by agreement, obtained by stipulation, the relief they sought for the future, which is all the relief the CAB could have given them in any event.

As pointed out by the trial court the CAB could in no event have authorized by order the conduct which has here been made the basis of the antitrust action. It goes without saying that the CAB could not, by any order entered by it, authorize overscheduling (which it found to exist) with "the predatory intent and purpose of eliminating plaintiff as a viable competitor" and "with full

knowledge of its impact on plaintiff and with the intent of injuring or destroying plaintiff."

Subsequent to oral argument counsel has called attention to the case Price v. Trans World Airlines, Inc., 481 F.2d 844 (9th Cir. 1973). In the *Price* case a plaintiff suing on behalf of a class of non-first class passengers brought an action under sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 15 and 22, alleging an unlawful combination and conspiracy based on the allegation that first class passengers were given headsets to be used in conjunction with inflight movies without charge, but that coach passengers were required to pay a charge for the use of such headsets. The plaintiff appealed to this Court a dismissal of the suit below and this Court modified the order of dismissal and directed that the case be remanded to the trial court with directions *"to stay all proceedings* in accordance with the views expressed" in the opinion. The views expressed by the Court were, to the effect that the charge for the use of headsets was a matter of tariff-making for the Board, a function expressly committed to the Board under section 406 of its expertise. The Court found that since, therefore, a determination by the Board that the $2.00 charge would be a proper rate to be fixed for this inflight service this would eliminate any issue to be tried in the antitrust action. Thus, this Court applied the same standard as did the Supreme Court in *Ricci, supra.* It felt it appropriate to defer to the expertise of the CAB fact findings that were confided explicity to the Board for its final determination, as is the case with respect to the making of tariffs.

Moreover, we find nothing inconsistent between our views here and the *Price* case, even though we here should consider that this was a matter as to which the Board was expressly charged to exercise its primary jurisdiction. As we have pointed out, the CAB here has already dealt to the full extent of its ability with the matters at issue and there is nothing further to be remanded to it even though the principle of primary jurisdiction were to apply. It has already determined that Aloha was injured by unecomical overscheduling by HAL. It has no authority under section 411 to make any inquiry or find any facts with respect to the existence of "predatory intent" or purpose to eliminate or destroy Aloha. Nothing else the Board could do would make unnecessary the fact finding in an antitrust suit by the district court.

The other matters raised by appellant need not now be dealt with since the interlocutory appeal was merely from the denial by the trial court of motions to dismiss the complaint or for summary judgment or judgment on the pleadings urged by the defendant. All other matters with which the trial court dealt are still at an interlocutory stage, and will be subject to further orders of that court as the record may develop. We hold merely that the trial court did not err in denying the motions.

The judgment is affirmed.