**INTERNATIONAL TRAVEL ARRANGERS, Plaintiff,**

v.

**WESTERN AIR LINES, INC., Defendant.**

No. Civ. 4–74–256.

United States District Court,
D. Minnesota,
Fourth Division.

March 5, 1975.

432

Harold J. Tomin, Los Angeles, Cal., for plaintiff.

Mackall, Crounse & Moore, Clay R. Moore, Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

MILES W. LORD, District Judge.

The defendant Western Air Lines, Inc. (Western) has moved this Court for an Order dismissing this antitrust action on the grounds that the subject matter is exclusively within the jurisdiction of the Civil Aeronautics Board (CAB). Alternatively, defendant moves that this Court stay all proceedings pending a referral of the issues in this suit to the CAB for adjudication. The alternative motion is based upon the doctrine of primary jurisdiction.

The complaint seeks damages for conduct alleged to be in violation of sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

The plaintiff International Travel Arrangers (ITA) is a Minnesota corporation formed in 1972 for the purpose of organizing various types of charter air transportation. ITA is not a "travel agent" as that term is usually used, i. e., ITA does not have the authority to issue air travel tickets. Rather ITA solicits and organizes various forms of group charter travel and enters into the necessary contractual arrangements with air carriers for that purpose. In addition, ITA organizes ground arrangements, hotel space, ground travel, etc., in connection with charter group travel flights. The primary emphasis of its business is the vacation or leisure travel market.

The defendant Western is a certificated scheduled airline serving many points in the United States, Hawaii and Mexico, as well as other foreign points. As immediately relevant to the issues of this case, Western provides direct service between the Twin Cities and Las Vegas and direct service between the Twin Cities and Hawaii.

The CAB has over the years created, by regulation, various forms of permitted charters. These regulations are currently found in 14 C.F.R. §§ 207, 208, 212, 214, 372a and 378. The plaintiff ITA organizes charter flights which fall into three categories encompassed by

these rules, single entity charters, affinity charters and travel group charters.

This case involves a type of permitted charter known as travel group charter which came into being as a result of regulations promulgated by the CAB effective September 27, 1972; 14 C.F.R. § 372a. Travel group charters were adopted for the purpose of allowing charter groups to be composed of persons who had no reason for association other than the charter flight itself. Prior rules, which required that the members of a charter group have some sort of prior "affinity," proved difficult to enforce.

The travel group charter rules are experimental and will terminate December 31, 1975 unless further regulatory action is taken by the CAB. 14 C.F.R. § 372a.5.

Western admits that from the beginning it has opposed the travel group charter concept and that it has published ads which point out its potential risks.

The background of ITA's antitrust claims involves in part ITA's relationship with the Minnesota State Automobile Association (MSAA). In 1972, ITA entered into certain arrangements with MSAA whereby MSAA would act as a "wholesaler" to a travel group charter program to be organized by the plaintiff.

In the summer of 1973, plaintiff organized several travel group charter trips to London which were sold through MSAA acting as a wholesaler. Also in 1973 the plaintiff and MSAA began to lay plans for a travel group charter program involving a number of flights to Hawaii and Mexico in January and February of 1974. Because of the provisions of the travel group charter rules, these flights were to be advertised several months in advance so as to comply with the various time requirements.

For several years, MSAA also had a continual working relationship with defendant Western, particularly with reference to vacation trips to Las Vegas. MSAA has organized a large number of three and four day Las Vegas trips for its members including hotel and other ground arrangements. These "Las Vegas Fun Fests" have been arranged through Western for air travel purposes, and Western, under its tariff, has been able to provide certain group rates to accommodate the MSAA trips. MSAA derives substantial revenues from its relationship with Western.

## THE CLAIMED ANTITRUST VIOLATIONS

ITA charges in its complaint that Western engaged in the following conduct in violation of the antitrust laws:

(a) Western Airlines, Inc., forced M.S.A.A. to boycott ITA. Western used as a coercive club the economic power of being the only regularly scheduled airline with direct Minneapolis-St. Paul/Las Vegas service. Western threatened to reduce seat availability to M.S.A.A. on its regularly scheduled service for M.S.A.A. GIT programs. M.S.A.A. sells through its network of retail travel offices approximately 20,000 GIT seats to Las Vegas per year. M.S.A.A. derives substantial revenue from these sales. Because of this threat to profitable business, M.S.A.A. severed its business dealings with ITA.

(b) Western Airlines, Inc. induced retail travel agents to boycott [travel group charters] and instead steer their passengers to more expensive forms of travel irrespective of the passengers' needs.

(c) Western Airlines, Inc. undertook a campaign of misleading and deceptive advertising in the media to disparage in the public's mind the reliability of [travel group charters].

(d) Western Airlines, Inc. at about the same time undertook a direct mail campaign to retail travel agents disparaging the honesty and reliability of [travel group charter] packagers and arrangers and the

reliability of supplemental air carriers.

The essence of these claims is that Western persuaded MSAA not to do business with ITA and that Western conducted a misleading and deceptive advertising campaign against ITA aimed at dissuading the public and retail travel agents from participating in travel group charters.

## REGULATORY POWER OF THE CAB

Section 102 of the Federal Aviation Act, 49 U.S.C. § 1302, defines the goals which the CAB is to promote in enforcing the Act.

§ 1302 . . .

(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and *foster sound economic conditions in,* such transportation, and to improve the relations between, and coordinate transportation by, air carrier;

(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or *unfair or destructive competitive practices* ;

(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

(e) The promotion of safety in air commerce; and

(f) The promotion, encouragement, and development of civil aeronautics. (emphasis added)

Section 411 of the Act, 49 U.S.C. § 1381, provides the CAB with a limited power to adjudicate disputes involving competitive practices.

§ 1381 Methods of competition.

The Board may, upon its own initiative or upon complaint by any air carrier, foreign air carrier, or ticket agent, if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier, foreign air carrier, or ticket agent has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof. If the Board shall find, after notice and hearing, that such air carrier, foreign air carrier, or ticket agent is engaged in such unfair or deceptive practices or unfair methods of competition, it shall order such air carrier, foreign air carrier, or ticket agent to cease and desist from such practices or methods of competition.

Specifically with regard to travel group charters, the provisions of § 372a.24 provide that:

No charter organizer shall engage in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof.

In addition to the above statutes, the CAB has issued interpretative regulations in 14 C.F.R. § 399(G) which set out various specific practices which the CAB considers deceptive. In particular, § 399.-80 declares as unfair and deceptive:

(f) Misrepresentations as to fares and charges for air transportation or services in connection therewith.

The remedial power of the CAB, as indicated by § 411 above, is limited to ordering offenders to cease and desist from practices or methods of competition which the CAB finds to be unfair. The CAB has no power to award compensatory damages.

## EXCLUSIVE JURISDICTION

A finding of exclusive CAB jurisdiction over conduct alleged to be an antitrust violation is a finding that the con-

duct is immune from the operation of the antitrust laws.

The Supreme Court of the United States has on several occasions warned that immunity from the operation of the antitrust laws is not to be lightly inferred from the enactment of a regulatory statute. *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945).

Recently in *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 218, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), the Supreme Court commented:

"Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *United States v. Philadelphia National Bank,* 374 U.S. 321, 350–351, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915. We have long recognized that the antitrust laws represent a fundamental national economic policy and have therefore concluded that we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry. 383 U.S. at 218, 86 S.Ct. at 784.

Section 414 of the Federal Aviation Act, 49 U.S.C. § 1384, expressly immunizes from the operation of the antitrust laws conduct which is authorized, approved or required by any order made under §§ 408, 409, or 412 of the Act.

The CAB under §§ 408 (49 U.S.C. § 1378) and 409 (49 U.S.C. § 1379) is given authority over consolidations, mergers, purchases, leases, operating contracts, acquisition of control of an air carrier, and interlocking relations. Pooling and similar arrangements are committed to CAB authority by § 412 (49 U.S.C. § 1382). None of the acts complained of in this litigation have been authorized, approved or required by the CAB under the above sections of the Act.

Two leading cases that discuss the question of exclusive CAB jurisdiction and its effects on the antitrust laws are *Pan American Airways v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), and *Hughes Tool Co. v. TWA,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

The facts of the *Pan American* case are set out in the majority opinion written by Mr. Justice Douglas as follows:

This suit, which the Civil Aeronautics Board requested the Attorney General to institute, charged two major restraints of trade. First, it is charged that Pan American and Grace, each of whom own 50% of the stock of Panagra, formed the latter under an agreement that Panagra would have the exclusive right to traffic along the west coast of South America free from Pan American competition and that Pan American was to be free from competition of Panagra in other areas in South America and between the Canal Zone and the United States. Second, it is charged that Pan American and Grace conspired to monopolize and did monopolize air commerce between the eastern coastal areas of the United States and western coastal areas of South America and Buenos Aires. Pan American was also charged with using its 50% control over Panagra to prevent it from securing authority from the C.A.B. to extend its route from the Canal Zone to the United States. 371 U.S. at 298, 83 S.Ct. at 478.

The Court in *Pan American,* upholding exclusive CAB jurisdiction, stated:

It seems to us, therefore, that the Act leaves to the Board under § 411 all questions of *injunctive relief* against the division of territories or allocation of routes or against combinations between common carriers and air carriers. (footnote omitted) (emphasis added) 371 U.S. at 310, 83 S.Ct. at 485.

The rationale of the Court's decision is set out by the Court as follows:

It would be strange, indeed, if a division of territories or an allocation of

routes which met the requirements of the "public interest" as defined in § 2 [of the original Civil Aeronautics Act of 1938, the counterpart of which is now 49 U.S.C. § 1302, quoted *supra* p. 434] were held to be antitrust violations. *It would also be odd to conclude that an affiliation between a common carrier and an air carrier that passed muster under § 408 should run afoul of the antitrust laws.* Whether or not transactions of that character meet the standards of competition and monopoly provided by the Act is peculiarly a question for the Board, subject of course to judicial review . . . . (citations omitted) (emphasis added) 371 U.S. at 309, 813 S.Ct. at 484.

Thus in *Pan American,* the Court was primarily concerned with the question of whether or not the federal counts applying the antitrust laws should interfere with CAB control over the division or territories, allocation of routes or combinations between carriers committed to the CAB's primary jurisdiction under § 408 and which the CAB could immunize from antitrust liability under § 414.[1]

In *Hughes Tool Co. v. TWA,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), the Supreme Court found immunity from damages under the antitrust laws for conduct which the Supreme Court concluded was "no more than the kind of conduct the CAB in 1950 had approved" 409 U.S. at 389, 93 S.Ct. at 661.

The Supreme Court described the controversy as follows:

The crux of TWA's complaint was the use by Toolco of its control over TWA to control and dictate the manner and method by which TWA acquired aircraft and necessary financing thereof. 409 U.S. at 366, 93 S.Ct. at 650.

The Supreme Court in reversing the Court of Appeals for the Second Circuit, 332 F.2d 602 (2d Cir. 1964), concluded that the Court of Appeals had erroneously rejected the defense offered by Toolco that those transactions complained of "were under the control and surveillance of the Civil Aeronautics Board and by virtue of the Federal Aviation Act of 1958 those transactions have immunity from the antitrust laws." 409 U.S. at 366, 93 S.Ct. at 651.[2] The Court went on to say:

*This result, we think, is required by §§ 408 and 414 of the Federal Aviation Act and by our prior decision in Pan American World Airways, Inc. v.*

[1]. Furthermore, the Supreme Court in *Pan American* recognized that if damages were sought a different problem would be presented which might require a stay in the proceedings pending referral of the issues to the CAB instead of an outright dismissal.

If it were clear that there was a remedy in this civil antitrust suit that was not available in a § 411 proceeding before the C.A.B., we would have the kind of problem presented in *Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc.,* 371 U.S. 84, 83 S.Ct. 157 (1962), where litigation is held by a court until the basic facts and findings are first determined by the administrative agency, so that the judicial remedy, *not available in the other* proceedings, can be granted. 371 U.S. at 313, n. 19, 83 S.Ct. at 486.

[2]. The Supreme Court disagreed with the Court of Appeals' characterization of the transactions in *Hughes* as transactions upon which the Board had the power to take action but did not do so.

One difficulty with the conclusion of the Court of Appeals that these transactions, unlike those involved in the *Pan American* case, were transactions on which the Board might take action but did not do so, is that it misconstrues the record. As noted, *from 1944 through 1960 every acquisition or lease of aircraft by TWA from Toolco and each financing of TWA by Toolco required Board approval. Each transaction was approved by the Board and each approval was an order under § 408, for the Board regarded its transactional orders as modifications or interpretations of its antecedent control order.* Each of the modification orders recited the finding of the Board that the transactions were "just and reasonable and in the public interest." 409 U.S. at 379, 93 S.Ct. at 657. (emphasis added)

The Supreme Court in *Hughes* did not disagree with the principal suggested in *Hughes* by the Court of Appeals that the CAB must affirmatively act before antitrust immunity for damages will be found. The Supreme Court found that the CAB had acted specifically on these issues on numerous occasions and as a result had immunized them from the antitrust laws. 409 U.S. at 386, 93 S.Ct. at 647.

*United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). (emphasis added)

The scope of the *Hughes* decision is reflected in the Supreme Court's Opinion where it said:

We by no means hold that the Federal Aviation Act completely displaces the antitrust laws. *Pan American*, 371 U.S., at 305, 83 S.Ct., at 482, 9 L.Ed.2d 325. But *where*, as here, *the CAB authorizes control* of an air carrier to be acquired by another person or corporation, and where the CAB specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, *the way in which that control is exercised in those precise situations is under the surveillance of CAB, not in the hands of those who can invoke the sanctions of the antitrust laws.* 409 U.S. at 389, 93 S.Ct. at 661. (emphasis added)

The conduct which was found in *Pan American* and *Hughes* to be immune from antitrust liability came within the CAB's primary jurisdiction under §§ 408 and 409. As such, it was subject to the immunity provision of § 414.

■ The conduct complained of here does not come within the immunity provisions of § 414.[3]

■ Western directs the Court's attention to § 411 of the Act and 14 C. F.R. § 372a.24 (discussed *supra*, p. 434). They do no more than prohibit unfair and deceptive practices in the air transportation industry and § 411 gives the CAB the power to investigate and put a stop to it.

Neither § 411 nor § 372a.24 are a grant of power to the CAB to confer antitrust

immunity.[4] Furthermore, § 372a.24 applies only to charter organizers.

*Aloha Airlines Inc. v. Hawaiian Airlines, Inc.*, 489 F.2d 203 (9th Cir. 1973), cert. den., 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974), involved conduct similar to that complained of here.

Aloha and Hawaiian Airlines were both air carriers providing nearly all air transportation of persons, property and mail among the several Hawaiian islands. The Court described the antitrust claims as follows:

Plaintiff listed seven acts which defendant allegedly undertook "with the predatory intent and purpose of eliminating plaintiff as a viable competitor" and "with full knowledge of its impact on plaintiff and with the intent of injuring or destroying plaintiff." These are: (1) excessive (vis a vis the needs of the public) flight schedules; (2) excessive purchasing, ordering, leasing (or agreeing to lease) of aircraft; (3) misrepresenting its schedules to the public; (4) providing below cost servicing to interstate air carriers between stops; (5 & 6) publicizing the fact that plaintiff and defendant should merge, while twice in bad faith renouncing merger agreements into which defendant had entered; and (7) opposing before the CAB plaintiff's request for a subsidy. As a result of these alleged practices, plaintiff claims it was damaged in the amount of $7,700,000 and prays for treble damages under section 4 of the Clayton Act, 15 U.S.C.A. § 15. 489 F.2d at 205.

---

3. Even if it could be otherwise argued that the conduct complained of in the case at bar came within the provisions of § 414 by reason of the travel group charter regulations being an order under § 408, 409 or 412 of the Act, the travel group charter regulations preclude this conclusion. Section 372a.20e, ·14 C.F.R. provides that "The relief granted by §§ 372a.20 and 372a.20b from sections 408, 409, and 412 of the Act shall not constitute an order under such sections within the meaning of section 414 of the Act, and shall not confer any immu-

nity or relief from operation of the 'antitrust laws. . . .' "

Sections 372a.20 and 372a.20b exempt charter organizers from various provisions of the Federal Aviation Act, including, but not limited to, §§ 408, 409 (in part), and 412, to which they would otherwise be subject.

4. See discussion *infra* of *Aloha Airlines Inc. v. Hawaiian Airlines, Inc.*, 489 F.2d 203 (9th Cir. 1973), cert. den., 417 U.S. 913, 94 S.Ct. 1612, 41 L.Ed.2d 217 (1974).

The Court of Appeals for the Ninth Circuit in *Aloha* rejected a claim of exclusive CAB jurisdiction, saying:

> As pointed out by the trial court the CAB could in no event have authorized by order the conduct which has here been made the basis of the antitrust action. It goes without saying that the CAB could not, by any order entered by it, authorize overscheduling (which it found to exist) with "the predatory intent and purpose of eliminating plaintiff as a viable competitor" and "with full knowledge of its impact on plaintiff and with the intent of injuring or destroying plaintiff." 489 F.2d at 211–212.

And, furthermore, that Court of Appeals concluded that:

> The grant of authority to the Board by section 411 does not withdraw from the antitrust litigants the right to proceed for damages alleged to have occurred by reason of antitrust violations of the kind which the Board has authority to deal with only by issuing a cease and desist order. 489 F.2d at 208.

The effect of concluding that the CAB has exclusive jurisdiction over the case at bar would be to deny the plaintiff a right to compensation for these alleged acts of unfair competition. The issuance of a cease and desist order will not compensate plaintiff for any injury which it might have suffered by reasons of Western's alleged conduct.

■ There appears to be no possibility that maintaining this action will conflict with the regulatory functioning of the CAB. This Court concludes that, in the case at bar, as in *Aloha*, the CAB has no power to immunize the conduct complained of from the operation of the antitrust laws. Furthermore, the CAB has not attempted to immunize this type of conduct. Therefore, for the reasons mentioned above, this Court finds that the CAB lacks exclusive jurisdiction over this controversy.

## PRIMARY JURISDICTION

Western moves alternatively, in the event that this Court should rule adversely to it on the question of exclusive jurisdiction, that this action be stayed pending reference of these issues to the CAB pursuant to the doctrine of primary jurisdiction.

The Supreme Court in *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), defined the test which Courts have since followed in determining whether or not an antitrust suit must be stayed pending proceedings of an administrative agency. The Court explaining two of its earlier decisions commented that Courts "must refrain from imposing antitrust sanctions for activities of debatable legality . . . in order to avoid the possibility of conflict between the courts and [agency]." 383 U.S. at 220, 86 S.Ct. at 786.

More recently in *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), the Supreme Court held that an antitrust action should be stayed for prior administrative proceedings where an agency decision will materially aid the Court in ultimately deciding the antitrust claims. 409 U.S. at 305, 93 S.Ct. 573.

■ The essential prerequisite for referral is that there exists some "plainly substantial" conflict between the antitrust laws and the Regulatory Act. 409 U.S. at 302, 93 S.Ct. 573.

The essential facts of *Ricci* were summarized in Mr. Justice White's majority opinion as follows:

> The case began when petitioner Ricci filed a complaint against the Chicago Mercantile Exchange, its president, vice president, and chairman of the board, and against the Siegel Trading Company, a member of the Exchange, and its president, charging a conspiracy in violation of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. § 1. The complaint alleged that Ricci had purchased a membership in the

Exchange in 1967, using funds borrowed from the Trading Company, and that in February 1969 the Exchange, at the instance of the Trading Company, transferred the membership to another, without notice and hearing, utilizing a blank transfer authorization that had previously been revoked. [footnote omitted] Allegedly, this course of conduct violated both the rules of the Exchange and the Commodity Exchange Act and was pursuant to an unlawful conspiracy aimed at restraining the conduct of Ricci's business. The result was, the complaint asserted, that Ricci was excluded from trading on the Exchange from February 11, 1969, until March 4, 1969, when he purchased another membership at a considerably higher price than the transferred membership had previously cost. 409 U.S. at 290–291, 93 S.Ct. at 574.

The Supreme Court held that the membership dispute should be referred to the Commodity Exchange Commission because the Commodity Exchange Act gives the Commission authority over membership criteria. 409 U.S. at 303, 93 S.Ct. 573.

Thus, in *Ricci*, there was a very real possibility that a valid membership rule might provide immunity from, or at least limit the scope of, antitrust liability. 409 U.S. at 303, 93 S.Ct. 573.

The Supreme Court was careful to point out that a decision by the Commission that membership was transferred pursuant to a valid rule would not preclude the antitrust court from passing upon the validity of the rule. 409 U.S. 303, 93 S.Ct. 573. The advantage of referral to the Commission is that a decision holding the membership transfer invalid under membership rules would remove the necessity of the antitrust courts considering the issue of possible antitrust immunity. 409 U.S. 304, 93 S.Ct. 573.

Western cites *Price v. Trans World Airlines, Inc.*, 481 F.2d 844 (9th Cir. 1973), and *Laveson v. Trans World Airlines, Inc.*, 471 F.2d 76 (3d Cir. 1972), in support of its position that the issues in this case are within the primary jurisdiction of the CAB.

Both of these cases allege antitrust violations by reason of a conspiracy among airline defendants to charge a $2.00 movie headset rental fee for coach passengers while first class passengers could use the headsets free of charge. The Court of Appeals for the Third Circuit in the *Laveson* case held that it could not determine the antitrust issues until it was decided whether or not the CAB could retroactively approve this charge. The Court therefore held that an issue of "debatable legality" was presented. 471 F.2d at 83.

The Court of Appeals for the Ninth Circuit in *Aloha, supra*, refusing referral of that controversy to the CAB explained its decision in *Price* and distinguished it as follows:

The views expressed by the Court were to the effect that the charge for the use of headsets was a matter of tariff-making for the Board, a function expressly committed to the Board under section 406 of its expertise. The Court found that since, therefore, a determination by the Board that the $2.00 charge would be a proper rate to be fixed for this in-flight service this would eliminate any issue to be tried in the antitrust action. Thus, this Court applied the same standard as did the Supreme Court in *Ricci, supra.* It felt it appropriate to defer to the expertise of the CAB fact findings that were confided explicity [sic] to the Board for its final determination, as is the case with respect to the making of tariffs. 489 F.2d 212.

*Price* and *Laveson* dealt with agreements affecting air transportation rates and charges expressly committed to the CAB's jurisdiction under § 412 and therefore subject to the immunity provision, § 414. This was not the case in *Aloha* and it is not the case in the instant action.

■ The Court of Appeals in *Aloha* refused referral of that controversy to the CAB because the CAB had no power

to immunize the complained of conduct from the antitrust laws. Here, as in *Aloha*, we are confronted with allegations of anti-competitive conduct which the CAB has neither acted upon nor has the power to immunize from the antitrust laws.

Western alleges that this dispute involves an experimental regulatory concept, travel group charters, and that the CAB should be given an opportunity to determine whether there have occurred "unfair or deceptive methods of competition within the meaning of section 411 of the Act, 49 U.S.C. § 1381 and travel group charter Rule § 372a.24.

As outlined earlier § 411 grants the Board the authority to investigate charges of unfair competition in the air travel industry and to issue cease and desist orders where appropriate. Section 372a.24 of the travel group charter rules prohibits *charter organizers* from engaging in "unfair or deceptive practices or unfair methods of air transportation or sale thereof."

However, § 411 and § 372a.20 confer no antitrust immunity and do not define anti-competitive conduct. Section 411 by itself does not remove any right of this antitrust litigant to proceed for damages, *Aloha* at 208 (see quote supra, p. 438). Section 372a.24 adds nothing to § 411.

The Court of Appeals in *Aloha* commenting on § 411 stated that:

> [The CAB] had no authority under section 411 to make any inquiry or find any facts with respect to the existence of "predatory intent" or purpose to eliminate or destroy Aloha. Nothing else the Board could do would make unnecessary the fact finding in an antitrust suit by the District Court. 489 F.2d 212.

There are no other relevant provisions of the Federal Aviation Act, the travel group charter regulations, or any orders of the CAB which present a "plainly substantial conflict" with the maintenance of this antitrust suit.

Furthermore, travel group charter rules promulgated by the CAB expressly disavow any intention to grant immunity as § 408, 409 or 412 orders. 14 C.F.R. § 372a.20c.

There is nothing to suggest that the conduct complained of here is either arguably lawful under CAB regulations, or could be made lawful by CAB action. Therefore, it would not be in any way helpful to this Court in deciding this antitrust suit to refer any of these issues to the CAB.

For the reasons outlined in this Memorandum and Order, defendant's motion to dismiss or, in the alternative, to refer these matters to the CAB, is hereby denied.

It is so ordered.