**Ralph NADER et al.**

v.

**ALLEGHENY AIRLINES,
INC., Appellant.**

No. 73–2243.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 10, 1974.

Decided May 2, 1975.

Rehearing and Rehearing En Banc
Denied June 23, 1975.

Frank F. Roberson, Washington, D. C., with whom William A. Bradford, Jr., Washington, D. C., was on the brief, for appellant.

Reuben B. Robertson, Washington, D. C., with whom Alan B. Morrison, Washington, D. C., was on the brief, for appellees.

James E. Landry and Donald C. Comlish, Washington, D. C., filed a brief on behalf of certain members of the Air Transport Association of America as amici curiae urging reversal.

Richard Littell, Gen. Counsel, C.A.B., O. D. Ozment, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Litigation and Research, Barbara Thorson, Atty., C.A.B., and Warren L. Sharfman, Sp. Counsel, C.A.B., filed a brief on behalf of Civil Aeronautics Board as amicus curiae urging reversal.

Before FAHY, Senior Circuit Judge, and McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by Circuit Judge TAMM.

Opinion filed by Senior Circuit Judge FAHY, concurring in part and dissenting in part.

TAMM, Circuit Judge:

Plaintiffs-appellees Ralph Nader and the Connecticut Citizen Action Group (CCAG) brought this suit in district court against defendant-appellant Allegheny Airlines, Inc. (Allegheny) after Allegheny dishonored Nader's reservation for one of its flights. Appellees alleged that as a consequence of Allegheny's actions, Nader was unable to appear at a fund-raising rally in behalf of CCAG, thereby causing the loss of $100,000 in contributions. Appellees claimed that the incident gave rise to a private damage remedy for unjust discrimination under section 404(b) of the Federal Aviation Act of 1958, 49 U.S.C. § 1374(b) (1970) and that Allegheny's failure to disclose the risk of being denied a seat

constituted fraudulent misrepresentation. They sought compensatory damages for lost contributions, and for various out-of-pocket expenses, and punitive damages of $150,000. After a non-jury trial, the district judge entered judgments for Nader on the section 404(b) claim and for both appellees on the claim of fraudulent misrepresentation. He assessed compensatory damages at $10 for Nader and $51 for CCAG and also awarded $25,000 punitive damages to each appellee. Nader v. Allegheny Airlines, Inc., 365 F.Supp. 128 (D.D.C.1973). Allegheny appeals the decision of the district court both with respect to liability and damages. The Air Transport Association of America, on behalf of certain of its members, and the Civil Aeronautics Board (the Board) have submitted briefs as amicus curiae.

Parts I and II of this opinion discuss the facts that led to the suit and the pertinent regulatory background. In part III, we first conclude that the trial judge's holding that Nader can recover under section 404(b) of the Act must be reversed and remanded because his findings of fact appear tainted by erroneous legal conclusions. We next hold that the finding that Allegheny committed fraudulent misrepresentation must be reversed and the case stayed until the Board determines whether the airlines' reservation practices are deceptive. Lastly, we conclude even assuming arguendo that Allegheny committed fraudulent misrepresentation, CCAG is not within the class that can recover. In part IV, we hold that punitive damages may not be awarded for a section 404(b) violation based on the record in this case. We also hold that while punitive damages ultimately may be assessed against Allegheny for fraudulent misrepresentation, the trial judge must consider whether Allegheny was relying upon the belief that its actions carried the approval of the Board, and therefore was acting in good faith.

## I. FACTS

Early in April, 1972, Ralph Nader, a well-known consumer advocate, agreed to make several appearances on behalf of CCAG, a Connecticut public interest corporation.[1] Nader's two principal appearances, designed to attract contributions and other support for CCAG, were scheduled for April 28, 1972—the first, a noontime rally in downtown Hartford, and the second at the Storrs campus of the University of Connecticut.[2]

On April 25, Nader reserved a seat for April 28 on Allegheny Airlines flight 864, which was scheduled to leave Washington at 10:15 a. m. and to arrive in Hartford at 11:15 a. m. On the morning of April 28, Nader's ticket was purchased from a travel agency and he departed for National Airport. Arriving at 10:05 a. m., Nader immediately proceeded to gate 17, the boarding and check-in area. Although Nader arrived at gate 17 approximately five minutes before the scheduled departure of flight 864, Allegheny's agent informed him that the flight was full and he could not be accommodated.[3] Nader told the agent of his imminent speech in Hartford and of the importance of his getting on the plane. The agent replied that the plane was full and that he (the agent) could not do anything about it. Nader then asked the agent to see if any stand-by passengers had been boarded or if anybody already on board was willing to give up his seat. The agent again replied that he was sorry but the plane was full and he could not do anything about it.[4]

Two other persons who had arrived ahead of Nader but after the plane was fully loaded were also denied boarding.[5] As was Allegheny's practice, the agent checked to determine the availability of suitable alternative transportation. He suggested the possibility of taking an Allegheny-sponsored air taxi to Philadelphia, where connections with an Allegheny flight scheduled to arrive in Hartford

1. Transcript of District Court Proceedings, September 4, 1972, Civ.No. 1346–72 at 15–16 (hereinafter Transcript).

2. *Id.* at 16, 42.

3. *Id.* at 17–19.

4. *Id.* at 18–21.

5. *Id.* at 173–75.

at 12:15 p. m. could be obtained.[6] While this alternative was acceptable to the two other passengers who had been denied boarding on flight 864, Nader rejected it. The connection was difficult to make as the air taxi was scheduled to arrive only ten minutes before departure of the Philadelphia-Hartford flight. If the connection were missed, Nader would not make his Storrs appearance as well as the one in Hartford. Moreover, Nader believed that in any event the 12:15 p. m. arrival might have been too late to salvage the Hartford rally. Therefore, he elected to fly to Boston, where he was met by a CCAG staffmember and driven to Storrs, arriving there at 2:30 p. m., approximately thirty minutes later than planned.[7]

As a consequence of Nader's failure to obtain a seat on flight 864, Nader and CCAG filed this suit, claiming compensatory damages for extra travel expenses and phone calls, lost contributions caused by Nader's failure to speak at the Hartford rally, and substantial punitive damages. The trial judge awarded Nader and CCAG compensatory damages for their incidental expenses,[8] denied CCAG's claim for lost contributions as too speculative,[9] and awarded each appellee $25,000 in punitive damages. Nader v. Allegheny Airlines, Inc., *supra.* Allegheny has vigorously objected to the trial judge's findings as to liability and damages.

## II. BACKGROUND

It is uncontroverted that Allegheny dishonored Nader's confirmed reservation because it had accepted more reservations for flight 864 than it had seats. This practice, in industry parlance, is known as overbooking. While sometimes inadvertent, the overwhelming majority of air carriers deliberately overbook certain flights.[10]

Deliberate overbooking is a response to several problems that have plagued the industry. The present reservation system offers maximum flexibility to the public: Reservations may be cancelled and changed with impunity and passengers are not generally penalized for missing a flight even though the seat cannot be filled.[11] As might be expected, this system results in a substantial reservation turnover before the flight departs.[12] Moreover, the industry must absorb the lost revenues caused by the "no-show" problem; some members of the air traveling public abuse the system by making single or multiple reservations that they never use and fail to cancel.[13] Other passengers who fully intend to use their reservations or intend to cancel are unable to do so through no

---

**6.** *Id.* at 21, 177–78.

**7.** *Id.* at 21–26.

**8.** The trial judge awarded Nader $10 in actual damages, which consisted of $7 for long-distance telephone calls and $3 for the additional cost of a ticket to Boston. CCAG was awarded $50 for the expense of sending a car to Boston to transport Nader to Storrs, Connecticut. Nader v. Allegheny Airlines, Inc., 365 F.Supp. 128, 130 (D.D.C.1973).

**9.** The trial judge awarded CCAG $1 for the invasion of its legal rights. CCAG has not appealed from the district court's refusal to award damages for lost contributions. *Id.* at 133.

**10.** Initial Decision, CAB Docket No. 26253, Emergency Reservation Practices Investigation, at 10 (June 10, 1974). *See also* Brief of Certain Members of the Air Transport Association of America as Amicus Curiae, at 5–6.

**11.** Initial Decision, CAB Docket No. 26253, *supra* note 10, at 8–9:

> The successful growth and development of air transportation has been aided in significant measure by the flexibility of the industry's reservation practices and procedures which make airline services easily available to the public. The airline passenger has substantial freedom of choice to make reservations at carriers' offices or through agents and to cancel them by telephone or in person. Also, should a ticketed passenger have a change of plans, he is free in most situations to use his ticket on flights of other air carriers without endorsement.

**12.** *See* Priority Rules, Denied Boarding Compensation Tariffs, And Reports Of Unaccommodated Passengers: Notice of Proposed Rule Making, CAB Docket No. 16563, 32 Fed.Reg. 459, 460 (CAB Order EDR–109, 1967).

**13.** *Id.*

fault of their own.[14] Lastly, empty seats may be carrier generated through computer or human error.[15] By studying a flight's history, air carriers are often able to predict with accuracy the reservation turnover and the number of no-shows. Through controlled overbooking based on statistical analysis of these historical studies, air carriers can reduce the chance that a fully-booked aircraft will depart with empty seats. Thus, the flexible reservation system functions with reasonable efficiency, passengers who would not otherwise be accommodated on the flight of their choice can make confirmed reservations, and carriers increase their load factor.[16]

Nevertheless, the practice of deliberate overbooking is far from perfect. Inevitably, there are instances in which more persons holding confirmed reservations appear for a flight than are predicted, and somebody must be denied boarding, or more commonly "bumped". The airline industry refers to this as an oversale situation. Although in statistical terms the number of oversales is small—5.4 oversales per 10,000 enplanements in 1972, and only 4.6 in 1973,[17] in absolute terms the number is substantial. Nearly 83,000 persons were bumped in 1972, and approximately 76,000 in 1973.[18] Obviously, inconvenience and hardship can and do occur when persons who expect to board a flight cannot do so.

The Civil Aeronautics Board has been cognizant of the no-show problem and of the benefits and detriments occasioned by the practice. Twice in the last twenty years, the Board has approved experiments that included penalties, service charges, ticketing time limits, and reconfirmation requirements. Although these policies reduced the incidence of no-shows, they caused customer resentment and ill-will. Parts of the program were found to be unenforceable, and these efforts were abandoned.[19] However, the Board remained interested in the area.[20]

The Board's current response to overbooking arose from a complaint filed by its Enforcement Bureau against National Airlines. The complaint charged, *inter alia*, that National's policy of deliberate overbooking was a deceptive practice and an unfair method of competition within the meaning of section 411 of the Federal Aviation Act, 49 U.S.C. § 1381 (1970). In National Airlines, Inc., Enforcement Proceeding, 31 CAB 390 (1960), the Board dismissed this part of the complaint, stating:

> Our determination to dismiss this proceeding insofar as it relates to overbooking is based solely on our finding, on review of the record, that the

**14.** Initial Decision, CAB Docket No. 26253, *supra* note 10, at 9.

**15.** *Id.*

**16.** *See* Priority Rules, Denied Boarding Compensation Tariffs, And Reports Of Unaccommodated Passengers: Notice of Proposed Rule Making, *supra* note 12, 32 Fed.Reg. at 460.

**17.** Brief for Civil Aeronautics Board As Amicus Curiae, Appendix B, at 50.

**18.** *Id.* Allegheny's statistics are in line with the industry average. In 1972, over 6300 persons were bumped on Allegheny flights, for a ratio of 6.3 oversales per 10,000 enplanements. In 1973, slightly less than 4800 persons were bumped, for a ratio of 4.5 oversales per 10,000 enplanements. *Id.* at 60–61.

**19.** Initial Decision, CAB Docket No. 26253, *supra* note 10, at 2–3; Emergency Reservation Practices Investigation: Order Instituting Investigation; Tentative Findings and Conclusions; and Notice of Proposed Rule Making, CAB Docket No. 26253, 39 Fed.Reg. 823, 824 (1974).

**20.** *See* Priority Rules, Denied Boarding Compensation Tariffs, And Reports Of Unaccommodated Passengers: Notice of Proposed Rule Making, *supra* note 12, 32 Fed.Reg. at 460. Even before the Board began to deal comprehensively with the problem through rule making, it had issued a number of orders that demonstrate its awareness of the nature of the overbooking problem. *See generally* CAB Order E–20859 (May 25, 1964); CAB Order E–18268 (April 27, 1962); CAB Order E–17914 (January 8, 1962); CAB Order E–15615 (August 4, 1960); CAB Order E–12817 (July 22, 1958); CAB Order E–12025 (December 16, 1957); CAB Order E–11658 (August 6, 1957); CAB Order E–11007 (February 6, 1957); CAB Order E–10545 (August 17, 1956); CAB Order E–9194 (April 29, 1955).

present forum is . . . too limited to permit an informed, overall appraisal of the problems and the conflicting policy considerations involved. . . . On this limited record, we are unable to appraise the scope or seriousness of these problems, and we have no information as to what other carriers have done by way of finding solutions, either similar to, or different from, that of the respondent.

We shall promptly institute an industry-wide investigation, which will provide a sound factual basis for the development of Board policy with respect to overbooking.

31 CAB at 392 (footnote omitted).

On the same day the Board announced its decision in *National Airlines,* it also instituted Docket 11683, Overbooking Practices of Trunkline Carriers Investigation (CAB Order E–15615, August 4, 1960). A number of carriers participated in this investigation, and a draft report was issued. *See* CAB Order E–20859 (May 25, 1964). On October 12, 1965, the Board issued a notice of proposed rule making in which it proposed to formulate an overbooking policy. Passenger Priorities And Overbooked Flights: Notice of Proposed Rule Making, 30 Fed. Reg. 13236 (CAB Order EDR–95, 1965). The Board's view at that time, as expressed in the explanatory statement accompanying the proposed rules, was that payment to compensate passengers was *not* a satisfactory solution, and that:

> The protection of the travelling public requires that carriers give passengers with reserved space an adequate and reasonably timely notice where, as a result of an overbooked condition and under priority rules, they would be denied boarding if all passengers with higher priority boarded the flight.

*Id.* The Board proposed that at a minimum, the carriers be required to give notice of an overbooked condition twelve hours prior to the scheduled departure of the flight. *Id.* at 13236–37.

Early in 1967, the Board instituted another proposed rule making, one which embodied the rules that form the core of the economic regulations that currently govern air carrier overbooking practices. Priority Rules, Denied Boarding Compensation Tariffs, And Reports of Unaccommodated Passengers: Notice of Proposed Rule Making, 32 Fed.Reg. 459 (CAB Order EDR–109, 1967). In its explanatory statement accompanying the proposed rules, the Board repudiated its 1965 position that carriers be required to give passengers notice of overbooked conditions. Among the reasons cited for withdrawing the earlier proposed rule were that it would create anxiety and confusion in the public, would cause the public to make a great number of duplicative and protective reservations, would produce a rapid turnover in reservations within the twenty-four hours before the departure of a flight, and would increase the no-show problem. *Id.* at 460. Moreover, the Board concluded that disclosure would force the carriers to terminate deliberate overbooking and to change their reservation practices substantially. *Id.* at 461. It was unwilling to put an end to deliberate overbooking because of its view that overbooking, while causing oversales, "also contributes to flexibility and freedom in securing, changing, and cancelling reservations." *Id.*

The Board recognized, however, its obligation to insure that oversales were reduced to a minimum and to find a solution that would accommodate the needs of the public and the industry. It noted that "[w]ith respect to the reservations practices of the carriers responsible for oversales, however, we conclude that these practices must either be regulated by the Board or that the denied boarding passengers be offered reasonable compensation." *Id.* The Board chose the latter alternative. In CAB Order ER–503, 32 Fed.Reg. 11939 (1967), the Board adopted, with minor modifications, the rules it had proposed earlier in 1967, in CAB Order EDR–109. These rules were designed to implement the Board's still current position that the interest of the public and the industry are each best served by continuing the present reservation practices, allowing the air carriers to continue their practice of deliberate

overbooking, but forcing them to eliminate the worst abuses.

Embodied in 14 C.F.R. §§ 250.1 et seq., the regulations require carriers to file priority rules with the Board to determine who shall be denied boarding on an oversold flight[21] and to file denied boarding compensation tariffs.[22] Compensation, generally the price of an one-way ticket to the passenger's first destination,[23] must be provided if the carrier cannot transport the passenger to his ultimate destination within two hours of the scheduled arrival time of the original flight.[24] The regulations also mandate that the carriers tender to each oversold passenger a written explanation of "the terms, conditions and limitations of the denied boarding compensation."[25] Lastly, carriers must file monthly reports of their oversale experience with the Board.[26]

The effect of these regulations is to eliminate the potential for abuse in three important ways. First, denied boarding compensation rules insure that as a practical matter the carriers will not engage in excessive overbooking. Since compensation equal to the value of a ticket must ordinarily be paid to an oversale, it is uneconomic for carriers to continuously accept so many reservations that they regularly leave passengers stranded. Second, if the flight is oversold, carriers must follow predetermined procedures for deciding which passengers will be denied boarding. Lastly, requiring the carriers to give the oversold passenger a written explanation of his rights should act as a deterrent to mistreatment.

These rules have remained in effect from 1967. However, the Board recently became concerned that the cut-backs in service begun in November, 1973 because of the Arab oil embargo would cause an increase in the no-show problem and would undermine the present reservation system. Therefore in CAB Order EDR–260, the Board gave notice of a proposed rule making and instituted Docket 26253, Emergency Reservation Practices Investigation, 39 Fed.Reg. 823 (1974). The Board proposed to establish ticketing time limits to retain confirmed reservations, impose refund penalties on no-show passengers, and increase denied boarding compensation by 300 per cent. Government, industry, and consumer interests are all represented in this proceeding, which is currently pending before the full Board after an initial decision by the administrative law judge.

---

**21.** § 250.3 Priority Rules.

Every carrier shall establish priority rules and criteria for determining which passengers holding confirmed reserved space shall be denied boarding on an oversold flight. Every carrier shall file with the Chief, Passenger and Cargo Rates Division, Bureau of Economics, two copies of such rules and criteria, including that portion of its company manual instructing employees on the order of boarding priorities in case of an oversold flight. Such rules and criteria shall not make, give or cause any undue or unreasonable preference or advantage to any particular person or subject any particular person to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

**22.** § 250.4 Filing of denied boarding compensation tariffs.

Subject to the exceptions provided in § 250.6, every carrier shall file tariffs providing compensation to a passenger holding confirmed reserved space who presents himself for carriage at the appropriate time and place, having complied fully with the carrier's requirements as to ticketing, check-in and reconfirmation procedures and being acceptable for transportation under the carrier's tariff, and the flight for which the passenger holds confirmed reserved space is unable to accommodate the passenger and departs without him.

**23.** § 250.5 Amount of denied boarding compensation.

Subject to the exceptions provided in § 250.6, the tariffs required by this part shall provide for compensation to be paid a passenger holding confirmed reserved space, as described in § 250.4, at the rate of 100 percent of the value of the first remaining flight coupon with a $25 minimum and a $200 maximum.

**24.** 14 C.F.R. § 250.6(b) (1974). Section 250.6 also contains other exceptions not relevant here.

**25.** Id. § 250.9 (1974).

**26.** Id. § 250.10 (1974).

In sum, the position of the Board, which is presently being re-evaluated, is that the practice of deliberate overbooking in combination with the carriers' present reservation practices is in the public interest. However, to protect those persons who are denied boarding because of deliberate overbooking, a scheme of reasonable compensation is required. This background becomes especially relevant in considering the misrepresentation issue.

## III. LIABILITY

A. *The Implied Private Damage Remedy for Violations of Section 404(b) of the Federal Aviation Act.*

Nader's first cause of action was predicated upon section 404(b) of the Federal Aviation Act of 1958, 49 U.S.C. § 1374(b) (1970), which provides, *inter alia,* that an air carrier may not unreasonably prejudice or unjustly discriminate against any person.[27] While the matter is not free from doubt, the trial judge apparently held that only Nader could recover on this theory.[28]

 Although the Act does not provide for private enforcement of section 404(b), it is well settled that a private damage action is available to remedy violations of this provision. *See, e. g.,*

Fitzgerald v. Pan American World Airways, Inc., 229 F.2d 499 (2d Cir. 1956); Wills v. Trans World Airlines, Inc., 200 F.Supp. 360 (S.D.Cal.1961). However, the elements of the cause of action and the litigant's evidentiary burdens are less certain. The trial court's opinion does little to clarify the confusion, and much of the parties' argument on appeal is addressed to the scope of its holding. Allegheny's deceptively simple position is that Nader failed to prove the elements of his cause of action. To adopt this position would dictate that we ignore the trial court's opinion and review the evidence *de novo.* This we cannot do. Nader argues that he established a *prima facie* case of discrimination; thereafter, Allegheny carried the burden of introducing rebuttal evidence. Nader maintains that Allegheny was unable to meet this burden, *that the trial judge so found,* and that his finding is not clearly erroneous.

 Before reaching the parties' contentions, we must determine the elements of an actionable section 404(b) violation as applied to oversales. In Archibald v. Pan American World Airways, Inc., 460 F.2d 14 (9th Cir. 1972), the Ninth Circuit held that the practice of overbooking does not *per se* give rise to

---

27. 49 U.S.C. § 1374(b) (1970) provides:

No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect whatsoever or subject any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

28. The district court's holding on this contention was: "The Plaintiff, Mr. Nader, is entitled to both compensatory and punitive damages under the antidiscrimination provisions of the Federal Aviation Act of 1958, Section 404(b), 49 U.S.C. § 1374(b)." Nader v. Allegheny Airlines, Inc., *supra,* 365 F.Supp. at 132 (D.D.C.1973). However, the district court's holding on the second claim, that of fraudulent misrepresentation, was that both appellees could recover. *Id.* at 132–33. Therefore,

we must conclude that the trial judge's failure to mention CCAG with respect to the implied private action arising from a violation of section 404(b) means that appellee CCAG failed to meet its burden of proof on this issue. *See* Switzer Bros., Inc. v. Locklin, 297 F.2d 39, 45 (7th Cir. 1961), cert. denied, 369 U.S. 851, 82 S.Ct. 934, 8 L.Ed.2d 9 (1962). Appellees appear to accept this interpretation of the district judge's decision as their first argument is captioned "[t]he trial court's finding that Allegheny unreasonably discriminated against *the plaintiff Nader* was not 'clearly erroneous'," while their second argument is premised by the statement: "The finding that Allegheny has engaged in fraudulent misrepresentations which caused injury to *plaintiffs* was not 'clearly erroneous'." Appellees' Br. at 16, 24 (emphasis supplied). Moreover, appellees have not argued in their brief that CCAG could recover on this claim. Despite appellant's contention that if the issue remains in the case CCAG cannot recover, we see no reason to give it further consideration.

an actionable section 404(b) violation. We agree with that conclusion. Carriers must be given a reasonable opportunity to ameliorate the loss of revenue occasioned by the no-show problem. Moreover, whether intentional overbooking is a reasonable response to that problem must be determined, in the first instance, by the Civil Aeronautics Board. This result is mandated by the doctrine of primary jurisdiction, which permits the agency to which Congress has delegated its regulatory power to determine whether a rule or practice is unreasonable or unjustly discriminatory, subject to the limitations generally imposed by judicial review of agency action. *See, e. g., Danna v. Air France,* 463 F.2d 407 (2d Cir. 1972).

■■■ Even if overbooking is not a *per se* section 404(b) violation, the determination of which passengers will be denied boarding presents the possibility for abusive and discriminatory actions. Therefore, each carrier is required by section 250.3 of the Board's economic regulations, 14 C.F.R. § 250.3, to establish and enforce nondiscriminatory priority rules for making this decision. Obviously, a carrier's violation of its own *prima facie* nondiscriminatory priority rules is the type of conduct that section 404(b) was designed to prevent. Several courts have specifically found that a carrier's violation of its priority rules gives rise to a section 404(b) cause of action. *Kaplan v. Luthansa German Airlines,* 12 Avi. ¶ 17,933 (Civil No. 68–2611, E.D.Pa. April 9, 1973); *Mortimer v. Delta Air Lines, Inc.,* 302 F.Supp. 276 (N.D.Ill.1969); *Wills v. Trans World Airlines, Inc., supra. See also Stough v. North Central Airlines, Inc.,* 55 Ill.App.2d 338, 204 N.E.2d 792 (1965). We find their reasoning persuasive. Nevertheless, defining the elements of the cause of action with respect to overbooking, namely (1) that the plaintiff possessed a designated priority, and (2) that the carrier boarded persons with a lower priority, does not end our inquiry. Although a plaintiff generally carries the burden of persuasion on each element of his cause of action, special circumstances may lead a

court to shift the burden of persuasion to the defendant on some part of the claim. One special circumstance commonly accepted is that the burden will be shifted where the material necessary to prove or disprove an element "lies particularly within the knowledge" of the defendant. *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615, 643 (1973); *see Campbell v. United States,* 365 U.S. 85, 96, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). We think that this exception must be applied to the case *sub judice*: Once the plaintiff proves that the carrier failed to honor his priority, the burden of proving the priority rules and compliance therewith shifts to the carrier. *Accord,* Archibald v. Pan American World Airways, Inc., *supra.*

Several considerations compel this result. The responsibility for promulgating and adhering to priority rules is delegated to the carriers by the Board, and the decision concerning which passengers will be denied boarding is solely within the carrier's control. Generally, any documents relating to the incident itself, its causes, and its resolution will be in the carrier's possession and the carrier will be in a better position to develop any needed documentation. Moreover, if the documents are difficult to discover, or if the carrier has not made and kept records, a plaintiff with a meritorious case would be unable to prosecute his action through no fault of his own. Thus, it makes sense from every perspective to place the burden on the carrier of showing how the priority rules legitimized its action.

■■■ The remaining issue is whether under the principles set forth above, the trial judge properly found that Nader established his right to recovery. We recognize that we are bound to accept the findings of fact of the trial judge unless they are clearly erroneous. *See, e. g., Case v. Morrisette,* 155 U.S.App. D.C. 31, 475 F.2d 1300, 1306–07 (1973). However, findings that an appellate court believes were induced by an erroneous interpretation of law are not shel-

tered by the clearly erroneous standard. *See* United States v. Singer Manufacturing Co., 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963); Case v. Morrisette, *supra,* 475 F.2d at 1307; Rowe v. General Motors Corp., 457 F.2d 348, 356 n. 15 (5th Cir. 1972). Moreover, while findings of fact need not be in any particular form, they must provide sufficient guidance for the appellate court to identify the basis of the decision. *See* Russo v. Central School District No. 1, 469 F.2d 623, 628–29 (2d Cir. 1972), cert. denied 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973); Alpha Distributing Co., Inc. v. Jack Daniel Distillery, Lem Motlow, Prop., Inc., 454 F.2d 442, 453 (9th Cir. 1972).

In the case *sub judice,* the trial judge made the following finding which, although placed with his conclusions of law, embodies the inferences drawn from the incident and contains the application of the law to the relevant facts:

> Mr. Nader has established a *prima facie* case of unreasonable discrimination: He possessed a confirmed reservation and ticket, and the resultant right to a seat. The Defendant, who intentionally over-sold the seats, did not honor that priority. *The Defendant has failed to sustain its burden of proof that the discrimination was reasonable by demonstrating company policy and why, in this particular case, its policy did not work an "undue or unreasonable prejudice or disadvantage in any respect whatsoever" to Mr. Nader, where the Defendant permitted passengers with subsequent or no reservations to have priority over a passenger with a confirmed reservation who had not been informed of the risks attendant to the Defendant's concealed policy of over-booking.*

Nader v. Allegheny Airlines, Inc., *supra,* 365 F.Supp. at 132 (citations omitted).

Certainly, the findings in the first two sentences are unobjectionable; the trial judge properly recognized Nader's evidentiary burden to establish a *prima facie* case. Indeed, the facts necessary for a *prima facie* case are undisputed; Nad-

er held a confirmed reservation for flight 864, had complied with Allegheny's preboarding conditions, and was entitled to a seat. Undeniably, Nader's priority was dishonored. Notwithstanding, we have considerable difficulty with the remainder, and cannot agree with appellee that the trial judge properly interpreted the law and found as a fact that Allegheny failed to prove its adherence to its priority rules in boarding flight 864.

That remainder, the sentence set out in italics above, certainly can be viewed as holding that Allegheny could not meet its burden of proof merely by introducing its duly filed priority rules and showing its adherence to them. In fact, the trial judge made no reference to the priority rules at all, and instead focused on a more general concept of reasonableness. If the trial judge expected Allegheny to prove the reasonableness of its rules with reference to some abstract judicial standard of that concept, then he made an error of law. It is beyond dispute that the reasonableness, *vel non,* of Allegheny's priority rules must be determined, in the first instance, by the Civil Aeronautics Board. *See* Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951). Moreover, the trial judge indicated that Allegheny failed to meet its burden of proof because it allowed "passengers with *subsequent* or no reservations to have priority over a passenger with a confirmed reservation . . . ." Nader v. Allegheny Airlines, Inc., *supra,* 365 F.Supp. at 132 (emphasis supplied). However, neither party contended that Allegheny determined boarding priority based on the time that a passenger made his reservation or purchased his ticket. Accordingly, asserting that Allegheny boarded passengers who reserved space after Nader is irrelevant unless the trial judge believed that he could make his own determination of reasonableness based on this record. Finally, this interpretation of the standard that the district court applied is reinforced by its

emphasis that passengers with subsequent or no reservations were boarded ahead of Nader although he "had not been informed of the risks attendant to the Defendant's concealed policy of overbooking." *Id.* Nader's knowledge of Allegheny's overbooking practices, while relevant to the misrepresentation issue, is not material to the section 404(b) cause of action.

 Because of ambiguities in the trial judge's findings, we cannot say that he properly interpreted the applicable law; nor can we say that he made findings of fact supportive of the conclusion that Allegheny violated its *own* priority rules in refusing to board Nader. Thus, we simply are in no position to affirm the district court's findings as formulated. Nevertheless, properly formulated findings of fact are not jurisdictional, *see* Davis v. United States, 422 F.2d 1139, 1142 (5th Cir. 1970); Securities & Exchange Commission v. Frank, 388 F.2d 486, 493 (2d Cir. 1968), and we need not remand the case if an intelligent review of the record can be undertaken despite their absence. *See* Group Association Plans, Inc. v. Colquhoun, 151 U.S.App. D.C. 298, 466 F.2d 469, 472 (1972). However, the record in this case conflicts at many crucial points and we cannot properly execute our review function without findings by the trial judge, who initially viewed the demeanor of the witnesses and can reopen the record if further evidence is necessary. A summary of the evidence will underscore our reasons for remanding the section 404(b) claim.

Allegheny's case consisted, *inter alia,* of the testimony of the agent who handled the denied boarding incident and the introduction of its manual that instructs its employees of the procedures to follow when a flight is oversold. The agent testified that when passengers are checked-in at the departing flight's boarding point, Allegheny's priority rules require boarding all passengers whose tickets have an "OK" marked in the sta-

tus column.[29] Passengers whose tickets are not marked "OK" can be boarded if their names appear on Allegheny's passenger list as holding a confirmed reservation. When the first oversale appeared, he checked the collected tickets and only one was not marked "OK"; the passenger holding that ticket appeared on the confirmed reservation passenger list.[30] According to the agent, when gate check-in is used, as here, selection of passengers to be denied boarding is automatic—the first person arriving after the flight is fully boarded is the first oversale, the second person becomes the second oversale, etc. Under no circumstances are agents to remove confirmed reservation passengers who already have been boarded.[31] The manual directly supports that portion of the agent's testimony relating to relevant procedures when an oversale is not discovered until a flight is being boarded and gate check-in is used. App. at 219.

To rebut Allegheny's case, Nader introduced two internal Allegheny memoranda. The first, exhibit B, a memorandum from Allegheny's Director of Reservations states: "We are attributing the three oversales to boarding discrepancies and planned capacity. Of the passengers boarded DCA/BDL, [Washington-Hartford] one was on the waitlist and one had been previously cancelled as a no-show." App. at 211. The second memo, exhibit C, lists the names of the two passengers who were boarded on flight 864 although they actually held lower priorities than Nader. *Id.* at 210. Nader argued that these exhibits proved that Allegheny had not followed its rules. Plaintiff's Post-Trial Memorandum at 7. Moreover, Nader contended that Allegheny's agent had followed the wrong section of the manual in deciding that selection of oversold passengers was automatic: If the agent could have determined in advance that the flight was oversold, then the manual requires the agent to choose passengers who would

---

**29.** Transcript, *supra* note 1, at 215.

**30.** *Id.* at 176, 206–07.

**31.** *Id.* at 182, 193.

be least inconvenienced. *Id.* Since the flight was overbooked, Nader maintained that this "clearing" procedure should have been followed. *Id.; see* App. at 94–95, 218–19.

▮ In sum, the transcript and exhibits reveal a number of relevant issues that the trial judge's findings do not resolve: (1) whether Allegheny's manual is sufficiently clear to establish its priority rules within the meaning of 14 C.F.R. § 250.3; (2) if so, what priority rules does the manual create, and whether the agent's interpretation comports with their language; and (3) assuming *arguendo* that the agent applied the proper rules, whether his testimony is credibile in view of Allegheny's internal memoranda. These issues simply cannot be resolved at the appellate level. Their proper resolution requires credibility findings and may even necessitate reopening the record so that the parties may discharge their burdens. As an appellate court we can do neither.

Allegheny has vigorously contested the need for a remand, arguing that Nader cannot prove that Allegheny's violations, if any, proximately caused his damages. Allegheny maintains that since, at most, two persons with lower priorities than Nader were boarded, and since the two other oversold passengers would have been boarded ahead of Nader by virtue of their earlier arrival at the gate, Nader would not have been boarded in any event. Unfortunately, this argument assumes that selection of passengers to be denied boarding was automatic—an assumption that is contested. Moreover, even if selection were automatic, we cannot say that Nader would not have been accommodated on flight 864. Certainly, the possibility exists that if the two boarding discrepancies had been discovered before departure, one of the other oversold passengers would have given Nader his seat after hearing of his predicament. Since the other oversold passengers elected to use the alternative transportation, they may not have been as concerned as Nader about getting to Hartford by 11:15 a. m. Thus, Allegheny's contention does not alleviate the need for a remand.

### B. *Common Law Misrepresentation*

Both Nader and CCAG recovered on the second cause of action, the common law tort of fraudulent misrepresentation. Applying the accepted definition of the tort,[32] the trial judge found that: Allegheny "knowingly and intentionally misrepresented a material fact, namely that Mr. Nader had a guaranteed reservation for a seat;" Nader and CCAG relied to their detriment on the misrepresentation; their reliance was reasonable; and CCAG could recover because it was foreseeable that members of the public would rely on Allegheny's misrepresentations. *Nader v. Allegheny Airlines, Inc., supra,* 365 F.Supp. at 132.

▮ Although the trial judge found that Allegheny, "through advertising and other means," affirmatively misrepresented to Nader that he had a guaranteed reservation for a seat, *id.* at 131, there is absolutely no probative evidence in the record to support a specific finding of an affirmative misrepresentation. In fact, the only record evidence on this issue is the testimony of Nader and of Allegheny's President, Leslie Barnes. Nader testified that since Allegheny advertises its reliability, publishes its schedule of flights, and accepts reservations, it was his understanding that a reservation would not be accepted unless a seat could be provided.[33] He was unable to show any specific instances of affirmative misrepresentations.[34] Barnes

32. The elements of fraudulent misrepresentation are set forth in Sankin v. 5410 Connecticut Avenue Corp., 281 F.Supp. 524, 545 (D.D. C.1968), aff'd sub nom. Benn v. Sankin, 133 U.S.App.D.C. 361, 410 F.2d 1060 (1969), cert. denied, 396 U.S. 1041, 90 S.Ct. 681, 24 L.Ed.2d 685 (1970):

(1) A false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation.

(citations omitted); *see* W. Prosser, Law of Torts, § 105 at 684–85 (4th ed. 1971).

33. Transcript, *supra* note 1, at 67–73.

34. *Id.* at 68–69, 72.

testified that Allegheny attempts to portray an image of reliability in its advertising, that Allegheny advertises that reservations may be made by contacting the airline or a travel agent, and that a passenger who makes a reservation has, "within normal latitudes," a reasonable expectation of receiving a seat.[35] Thus, we reverse the finding that Allegheny affirmatively represented to Nader that he had a guaranteed reservation for a seat because it is clearly erroneous and without evidentiary support.

▮▮▮▮ In reality, the gravamen of appellees' complaint is *nonrepresentation* rather than misrepresentation. The issue that the court must decide is, assuming *arguendo* that the public shares the perception, created either by the aura of Allegheny's advertising or more generally, by shared societal notions about the meaning of a confirmed reservation, that a confirmed reservation guarantees a seat, whether Allegheny had a duty to disclose the possibility that its policy of deliberate overbooking could alter these expectations. To resolve this question, we address the contention, pressed by Allegheny and the Civil Aeronautics Board, that the existence of the Board's power under section 411 of the Federal

Aviation Act, 49 U.S.C. § 1381 (1970), to investigate and determine whether an air carrier "has been or is engaged in unfair or deceptive practices or unfair methods of competition"[36] precludes a common law tort action for fraudulent misrepresentation. In effect, appellant and amicus curiae argue that the Board's regulatory power over reservation practices, which are intertwined with the level and structure of air fares, gives it exclusive jurisdiction over these practices and eliminates common law remedies. Nader's response is that Congress did not intend to pre-empt all private tort actions involving airline practices when it passed the Federal Aviation Act.[37] Thus framed, the issue becomes the effect, if any, the passage of the Federal Aviation Act had on the remedies available for the common law misrepresentational torts of air carriers.

▮▮▮ It seems clear that the deceptive practices that the Board has power to proscribe under the Act would include all of the carrier misrepresentations actionable under the common law. However, we simply cannot accept the proposition that the existence of the Board's power under section 411 eliminates all private remedies for common law torts

---

**35.** Deposition of Leslie N. Barnes, at 7–8, 11–13. Barnes' deposition was accepted as his testimony in lieu of his appearance. Transcript, *supra* note 1, at 96–97.

**36.** § 1381. Methods of competition.

The Board may, upon its own initiative or upon complaint by any air carrier, foreign air carrier, or ticket agent, if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier, foreign air carrier, or ticket agent has been or is engaged in unfair or deceptive practices or *unfair methods of competition in air trans-portation or the sale thereof.* If the Board shall find, after notice and hearing, that such air carrier, foreign air carrier, or ticket agent is engaged in such unfair or deceptive practices or unfair methods of competition, it shall order such air carrier, foreign air carrier, or ticket agent to cease and desist from such practices or methods of competition.

**37.** Appellees also argue that Allegheny waived this defense and several variations

that relate to primary jurisdiction by failing to raise them in an appropriate manner before the district court. While Allegheny could have significantly aided the district court proceedings by presenting its jurisdictional argument more vigorously, Allegheny's third defense to appellee's complaint adequately apprised the district court of appellant's position:

This action does not appropriately belong within the jurisdiction of this Court in that it challenges the legality and propriety of Defendant Allegheny's reservation and denied boarding practices, which considerations are by law assigned to the Civil Aeronautics Board and not to the courts.

Appendix at 13. Moreover, we must agree with the Fifth Circuit that since such questions involve "the proper allocation of business between the courts and administrative agencies," they may not be waived. Louisiana & Arkansas Railway Co. v. Export Drum Co., Inc., 359 F.2d 311, 314 (5th Cir. 1966).

arising from those types of misrepresentations or other forms of unfair or deceptive practices. The Supreme Court has noted in American Airlines, Inc. v. North American Airlines, Inc., 351 U.S. 79, 85, 76 S.Ct. 600, 100 L.Ed. 953 (1956) that section 411 of the Federal Aviation Act was modeled after section five of the Federal Trade Commission Act, and this court indicated in Holloway v. Bristol-Myers Corp., 158 U.S.App.D.C. 207, 485 F.2d 986, 989 (1973), that the remedies of section five were additional to rather than in derogation of the common law remedies for fraud and deceit. Moreover, while the arsenal of remedies available to the Civil Aeronautics Board is significant, it does not include the power to award damages to injured parties.[38] Finally, to hold that the Act preempts the common law remedies would ignore section 1106 of the Act, 49 U.S.C. § 1506 (1970), which states: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

However, despite the similarities between section 5 of the Federal Trade Commission Act and 411 of the Federal Aviation Act, the differences between the two would itself suggest that the common law misrepresentational torts did not remain unaffected by the Act. The Supreme Court recognized as much in American Airlines, Inc. v. North American Airlines, Inc., supra, 351 U.S. at 83–84, 76 S.Ct. at 604:

Section 5 is concerned with purely private business enterprises which cover the full spectrum of economic activity. On the other hand, the air carriers here conduct their business under a regulated system of limited competition. The business so conducted is of especial and essential concern to the public, as is true of all common carriers. . . . Finally, Congress has

committed the regulation of this industry to an administrative agency of special competence that deals only with the problems of the industry.

■■■ This conclusion, that the common law remedies for fraud and deceit cannot remain totally unaffected by the Act, is buttressed by the fact that the practices at issue have a significant rate making effect. Besides the Board's power to control deceptive practices, section 102 of the Act, 49 U.S.C. § 1302 (1970), charges the Board with the responsibility for promoting a number of goals that Congress specifically found to be in the public interest. In carrying out its functions, the Board is to encourage the "development of an air-transportation system properly adapted to the present and future needs of . . . foreign and domestic commerce . . .," and is to promote "adequate, economical, and efficient service . . . by air carriers at reasonable charges . . . ." (emphasis supplied). Further, section 1002(e), 49 U.S.C. § 1482(e) (1970) requires the Board, in its rate making capacity to balance "[t]he need in the public interest of adequate and efficient transportation service . . . at the lowest cost consistent with the furnishing of such service . . ." with "[t]he need of each air carrier for revenue sufficient . . . to provide adequate and efficient . . . service." Having charged the Board with these important responsibilities, Congress must have necessarily given the Board the power to carry out its functions. We think that this power must be read broadly to include the approval in the public interest of some practices that might be considered common law misrepresentations. The effect of such approval, or a holding that they do not represent deceptive practices, would be to establish that the practices, as a matter of law, do not constitute common law misrepresentations.[39]

38. Compare T.I.M.E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959) with Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc., 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962).

39. Our holding neither gives the Board unwonted power nor insulates such practices from judicial scrutiny. Board orders are subject to review in the Courts of Appeals and must be supported by substantial evidence. See 49 U.S.C. § 1486 (1970).

Lastly, although the saving clause of section 1106 purports to speak in absolute terms it cannot be read so literally. Nearly seventy years ago, in the celebrated case of Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 446, 27 S.Ct. 350, 358, 51 L.Ed. 553 (1907), the Supreme Court, ruling on the applicability of an identical clause in the Interstate Commerce Act, stated: "This clause, however, cannot in reason be construed as continuing in shippers a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself."

■■■ We believe that the factors outlined above indicate that Congress, by enacting the Federal Aviation Act, expected some alteration of the common law so that the Board could effectively regulate the airline industry in the public interest. Thus, if the Board properly finds that a practice is not deceptive, a common law action for misrepresentation must fail as a matter of law. Given this interpretation, when the allegedly tortious practice is one that has been directly regulated by the Board, or while not directly regulated is so obviously tied to a regulated practice or rate that a change in one would require a change in the other, the Board must determine, in the first instance, whether the practice falls within the ambit of the deceptive practices provision of section 411.[40]

■■■ This result is but another application of the principles of primary jurisdiction, a doctrine whose purpose is the coordination of the workings of agency and court. See 3 K. Davis, Administrative Law Treatise, § 19.01 (1958). Primary jurisdiction recognizes that even though a claim may be cognizable in the courts, technical questions often call for the judgment of an agency presumably expert in the field under judicial consideration. Perhaps more importantly, where Congress has entrusted the regu-

lation of an industry to a single regulatory body, uniformity of policy and practice can only be achieved by submitting relevant issues to the affected agency for consideration. See generally Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); Price v. Trans World Airlines, Inc., 481 F.2d 844 (9th Cir. 1973); Lichten v. Eastern Airlines, Inc., 189 F.2d 939 (2d Cir. 1951); Adler v. Chicago & Southern Air Lines, Inc., 41 F.Supp. 366 (E.D.Mo.1941).

■■■ It is beyond peradventure that the requisites for submission to the Board are met in this case. As demonstrated in part II, the Board has been quite active in this area and has recognized the relationship of the carriers' reservations policies to the structure and level of air fares. Moreover, the discussion of deliberate overbooking in part II illustrates that the determination whether overbooking is or is not a deceptive practice involves technical and policy judgments that should properly be submitted to the Board in the first instance. Finally, since the problems are as wide as the industry itself, a single, industry-wide resolution is appropriate. Thus, in the absence of an existing Board decision disposing of this question, the issue of whether the air carriers' overbooking policies, including their policy of nondisclosure, may be characterized as a tortious misrepresentation must first be submitted to the Board to ascertain whether the conduct violates section 411.

■■■ The question remains whether an existing decision of the Board obviates the need for the parties to undertake a new adjudicatory proceeding before that agency. We take judicial notice of a proceeding currently before the Board, which has raised the issues under consideration here. We believe that the resolution of that proceeding should eliminate the need for further resort to the Board.

---

40. On the other hand, a Board finding of deceptiveness does not end the case. Other elements of the tort, for example, knowledge and reliance where the complaint alleges fraudulent misrepresentation, remain to be adjudicated.

In part II, we summarized the recent history of the Board's involvement in regulating the carriers' overbooking practices. After tracing that history, we noted that late in 1973, the Board became concerned that the cutbacks in air carrier service necessitated by the Arab oil embargo might lead to an increasing no-show problem that could cause a breakdown in the present reservation system. Therefore, on January 3, 1974, the Board announced an investigation into air carrier reservation practices and a rule making. Emergency Reservation Practices Investigation, 39 Fed.Reg. 823 (CAB Order 73–12–93, EDR–260, 1974). The Board categorically stated that the following issue was to be resolved in this proceeding:

Whether, in light of the fuel allocation program, the present rules, regulations, or practices of all domestic certificated air carriers (except all-cargo carriers) pertaining to ticketing, reservations (including reconfirmation), and denied boarding compensation in interstate air transportation, *are* or will be unjust or unreasonable, or unjustly discriminatory, or unduly preferential, or unduly prejudicial, or otherwise unlawful; and if so, what should be the lawful rules, regulations or practices to be determined and prescribed by the Board.

*Id.* at 826 (emphasis supplied). All certificated passenger carrying airlines were made parties to the proceeding and numerous other organizations, including those representing business and consumer interests, intervened.

Among the intervenors in the Emergency Reservation Practices Investigation is the Aviation Consumer Action Project (ACAP). This organization, which was organized to promote the interests of the air travelling public, participated extensively in all phases of the investigation. Besides cross-examining many of the carriers on their overbooking practices, ACAP specifically called into question the legality of the practice of deliberate overbooking and of the carriers' refusal to disclose this practice to the public. ACAP's brief to the administrative law judge opined:

It is ACAP's view that, if there has been any material increase in deliberate multiple overbooking during recent months, this should be seen as a natural defensive strategy to what the public sees as unstable conditions in the industry and abusive practices by the carriers. In short, much of the travelling public has lost confidence in the reliability and integrity of airline commitments because of schedule irregularities, last-minute equipment substitutions, employee layoffs, frequent misinformation and lack of candor by the carriers, and the recent revelations of industry-wide practices of deliberate overbooking. *See e. g.,* Nader v. Allegheny Airlines, Inc., 365 F.Supp. 128 (D.D.C.1973). By controlling those practices to protect the public, much of the incentive for multiple overbooking would be removed.

Opening Brief of the Aviation Consumer Action Project, Emergency Reservation Practices Investigation, *supra,* at 5–6 (citation omitted).

Moreover, in describing its suggested revisions of the current reservations practices, ACAP argued specifically that deliberate overbooking is a deceptive practice that should be held unlawful and prohibited:

This proceeding has established for the first time, as a matter of record, the astonishing fact that all of the major scheduled carriers engage in some form of deliberate overbooking of their flights. Most of the carriers have also admitted that they do not advise their passengers of this practice. While this is consistent with the findings of the District Court in Nader v. Allegheny Airlines, *supra,* it is the first time that this information has actually been made available to the Board, and the first time that the Board has ever been called upon to deal with this situation in such a direct way. . . .

\*　　\*　　\*　　\*

ACAP believes the practice of deliberate overbooking, compounded by concealment and failure to warn, always has been and is still unfair, deceptive, unjust, unreasonable, unduly prejudicial, discriminatory, and illegal. *Id.* at 12–14 (citations omitted). In short, there can be no doubt that ACAP, through its extensive cross-examination of airline witnesses and through its brief, raised the issue of whether the carriers' overbooking policies are deceptive, unjustly discriminatory, or otherwise unlawful.

Just as surely, there can be no doubt as to the decision of the administrative law judge. In his decision, issued June 10, 1974, he recognized the dimensions of the overbooking problem and noted that between 1969 and 1973 the carriers reduced the actual number of persons denied boarding by 43 percent while the number of passenger enplanements increased by some 20 million persons.[41] Moreover, the administrative law judge noted that "[n]o real contention, much less a showing, has been made that present levels of denied boarding compensation are not compensatory or that they are otherwise inadequate to make a passenger whole, which was the fundamental underlying purpose for the enactment of the regulation."[42] However, the most important and definitive part of the decision for our purposes is found in the order accompanying the opinion, which states:

> The present rules, regulations, and practices of domestic certificated scheduled air carriers pertaining to ticketing, reservations (including reconfirmation), and denied boarding compensation, in interstate transportation . . . are not unjust or unreasonable, unjustly discriminatory, unduly preferential, unduly prejudicial, or otherwise unlawful;[43]

We think that the decision in the Emergency Reservation Practices Investigation should substantially resolve whether the practices at issue are deceptive within the meaning of section 411. *Cf.* Aloha Airlines, Inc. v. Hawaiian Airlines, Inc., 489 F.2d 203, 211 (9th Cir. 1973), cert. denied, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974). However, since petitions for discretionary review of the administrative law judge's decision are currently pending before the Board, we instruct the district court to stay further proceedings on the misrepresentation cause of action pending the outcome of the proceedings in the Emergency Reservation Practices Investigation.[44] *See* Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940). While it is possible that, in light of the broader scope of those proceedings, the Board would not in the normal course give specific attention to the deceptiveness of failing to publicize overbooking practices, we may assume that the Board will give the matter such attention (*sua sponte* if necessary) in response to this opinion.

---

**41.** Initial Decision, CAB Docket No. 26253, *supra* note 10, at 29.

**42.** *Id.* at 51.

**43.** Order of Associate Chief Administrative Law Judge Robert L. Park, Emergency Reservations Practices Investigation, CAB Docket No. 26253 (June 10, 1974) (Order accompanies Initial Decision).,

**44.** Our resolution of this issue makes it unnecessary to consider at length appellees' argument that citizen complaints cannot trigger section 411 proceedings. We simply note that appellees have not explained why a court could not expect the Board to act on its own motion—as it may under section 411—when a court has stayed its proceedings to allow the Board to consider an issue, or why a citizen could not initiate a section 411 proceeding by using the procedures set forth in section 1002(a), 49 U.S.C. § 1482(a) (1970). *See* Aviation Consumer Action Project v. Trans World Airlines, Inc., CAB Order 72–11–106 (November 24, 1972), aff'd sub nom. Aviation Consumer Action Project v. C. A. B., 161 U.S.App.D.C. 237, 494 F.2d 1156 (1974) (no opinion). Moreover, we see no reason why an air carrier cannot be ordered by the court to initiate section 411 proceedings when the carrier seeks to invoke the Board's jurisdiction.

There is one final question in this area requiring resolution—assuming Allegheny's liability for misrepresentation, whether appellees may recover for their reliance. The trial judge's award of damages to CCAG raises one of the most troublesome problems in this area of tort law: when may a third party recover his pecuniary losses for reliance on a misrepresentation that was not made to him. In this case, the trial judge employed the following reasoning to conclude that CCAG as well as Nader could recover for Allegheny's misrepresentation:

> CCAG is eligible and entitled to recover herein for damages it has incurred due to the Defendant's intentional misrepresentation even though they were not direct parties to the transaction in issue because: (1) The misrepresentation was knowingly and intentionally made; privity of contract is not required here; (2) CCAG was within the class of foreseeable plaintiffs (the class is determined by the Defendant's legal duty to the public at large both under its license and by its better position to prevent injury to the public by full disclosure of its practices affecting the public); (3) CCAG made a reasonable reliance on the misrepresentation and was thereby damaged.
>
> · · ·

Nader v. Allegheny Airlines, Inc., *supra,* 365 F.Supp. at 132–33 (citations omitted).

▮ Of course, questions involving the scope of liability for fraudulent misrepresentation are questions of "local" rather than federal law. Thus, we must look to the common law of the District of Columbia since, under all of the various choice of law principles, the law of this jurisdiction would be applied. *See generally* Dovell v. Arundel Supply Corp., 124 U.S.App.D.C. 89, 361 F.2d 543 (1966); Emmert v. United States, 300 F.Supp. 45 (D.D.C.1969). Apparently, the question of third party recovery for fraudulent misrepresentation is virtually one of the first impression, as the parties have not referred us to any District of

Columbia decisions that have confronted this issue, and our research has uncovered only one such case. In that case, New York Title & Mortgage Co. v. Hutton, 63 App.D.C. 266, 71 F.2d 989, cert. denied, 293 U.S. 605, 55 S.Ct. 122, 79 L.Ed. 696 (1934), the court applied the then prevalent rule to determine that a title company which lauded the facilities of another title company by letter in order to obtain title business could not be held liable for fraudulent misrepresentation where the letter was used by the other title company to aid in the sale of its stock. We therefore turn to the legal principles that have guided other courts and commentators.

▮ It is unequivocal that privity of contract is not a prerequisite to recovery where the plaintiff proves fraudulent misrepresentation. *See, e. g., id.* at 991; Miller v. Bargain City, U. S. A., Inc., 229 F.Supp. 33, 39–40 (E.D.Pa.1964); Oppenhuizen v. Wennersten, 2 Mich.App. 288, 139 N.W.2d 765 (1966). *But see* Denning v. Bolin Oil Co., 422 F.2d 55, 58 (10th Cir. 1970) (applying Oklahoma law). Even before the celebrated case of Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931), the generally accepted rule was that the maker of a fraudulent misrepresentation is liable to those he intends to influence, regardless of privity of contract. *See, e. g.,* Wollenberger v. Hoover, 346 Ill. 511, 179 N.E. 42, 67 (1931); Restatement (Second) of Torts, Explanatory Notes § 531, at 96 (Tent.Draft No. 10, 1964). In *Ultramares,* Justice Cardozo, while Chief Judge of the New York Court of Appeals, broadened the rule by finding that an accountant not only owed a duty to his employer to prepare and certify financial statements without fraud, but also owed the same duty to creditors and investors to whom the financial statements might be exhibited, "since there was notice in the circumstances of its making that the employer did not intend to keep it to himself." 174 N.E. at 444. In 1964, the revisors of the Restatement of Torts reported that "[t]he prestige of the case has been so great

that it must be taken as a new point of departure. The problem is to find language to state the broader rule without going too far." Restatement (Second) of Torts, *supra,* at 96.

Nevertheless, the elimination of the privity requirement and the further broadening of the rule pioneered by *Ultramares* does not mean that every aggrieved third party may recover from the maker of a misrepresentation. To allow recovery without limiting third parties in any respect raises the spectre of an indeterminate liability totally disproportionate to any notion of fault involved, especially in view of the ease of proving reliance. Thus, the class of persons who may recover has been defined by the revisors of the Restatement of Torts as those persons to whom the maker "intends or has reason to expect to act . . . in reliance upon the misrepresentation." *Id.* at 95. The revisors explain that:

> for the maker of a fraudulent misrepresentation to have reason to expect that it will reach third persons and influence their conduct, it is not enough that he recognizes, or as a reasonable man should recognize, the risk that it may be communicated to them and they may act upon it. . . .
>
> Virtually any misrepresentation is capable of being transmitted or repeated to third persons, and if sufficiently convincing may create an obvious risk that they may act in reliance on it. Such a risk is not enough for the liability covered in this Section.

*Id.* at 102.

Dean Prosser took a similar view. He stated that where the defendant commits fraudulent misrepresentation, an unidentified member of a group or class may recover if the defendant has *special reason* to expect that any member of the class may be reached and influenced. However, he was quick to point out that "the line is definitely drawn" where the plaintiff is unidentified and the defendant has no special reason to expect that he may act in reliance:

The defendant may well be aware that his representation is capable of being passed on to others, and that at some subsequent date it may come into the hands of someone who will rely on it, act upon it, and suffer loss if it is false. But this amounts to nothing more than the general foreseeability of transmissions to others which is inseparable from the human word. In the face of indeterminate extent, magnitude, and duration of liability, the courts always have drawn back from its imposition.

Prosser, Misrepresentations and Third Persons, 19 Vand.L.Rev. 231, 251–52 (1966) (citation omitted); *see id.* at 246–53. Court decisions have generally supported this limitation; no court has gone any further and many restricted recovery to a greater extent. *See, e. g.,* Denning v. Bolin Oil Co., *supra,* 422 F.2d at 59 (concurring opinion); Miller v. Bargain City, U. S. A., Inc., *supra,* 229 F.Supp. at 38–40; Pamela Amusement Co., Inc. v. Scott Jewelry Co., 190 F.Supp. 465, 468 (D.Mass.1960); Cohen v. Citizens National Trust & Savings Bank, 143 Cal.App.2d 480, 300 P.2d 14 (1956); Gulf Oil Corp. v. Newton, 130 Conn. 37, 31 A.2d 462 (1943); Metric Investment, Inc. v. Patterson, 101 N.J.Super. 301, 244 A.2d 311 (App.Div.1968); Westcliff Co., Inc. v. Wall, 153 Tex. 271, 267 S.W.2d 544 (1954); *cf.* Rozny v. Marnul, 43 Ill.2d 54, 250 N.E.2d 656, 662–63 (1969). With these principles in mind, we consider whether Nader and CCAG are within the class of persons who may recover.

■■ Although the trial judge apparently did not explicitly consider Nader's position, it is manifest that Nader was not in privity with Allegheny at the time of the misrepresentation, nor was he identified as a person to whom the misrepresentation was directed. However, he was within an identifiable class of third persons—potential passengers—that Allegheny intended to influence. Although the class of persons is large, liability is justified by the notion that, in general, loss caused by intentional

wrongdoing should be placed on the wrongdoer rather than on the innocent party. *See* Rusch Factors, Inc. v. Levin, 284 F.Supp. 85, 90 (D.R.I.1968).

 CCAG, however, is a party more remote from the transaction than Nader. It was not identified to Allegheny until this law suit was instituted.[45] Allegheny had no special reason to know of CCAG's reliance or even of its existence. In fact, CCAG is really a member of a vast indeterminate class that may be equated with the public itself. The trial judge seems to have recognized this, as he stated: "It was foreseeable that the Defendant's intentional misrepresentation would be relayed to other *members of the public* and that they would rely upon the Defendant's representation . . . ." Nader v. Allegheny Airlines, Inc., *supra*, 365 F.Supp. at 132 (emphasis supplied). However, as discussed above, foreseeability is not the test to be used in determining the class of third persons who may recover; otherwise, liability in a case such as this could become indeterminate. To hold that CCAG is within the class of persons who may recover would mean that virtually any plaintiff, no matter how far removed from the transaction or incident, can recover the full amount of his damages. We are unwilling to extend liability that far and consequently hold that CCAG cannot recover as Allegheny's duty did not extend to it.[46]

## IV. PUNITIVE DAMAGES

The trial judge awarded punitive damages of $25,000 to each appellee. Nader's award was apparently premised both on the finding that Allegheny violated section 404(b) and that it misrepresented material facts; CCAG's award was apparently based only on the latter ground. *See* Nader v. Allegheny Airlines, Inc., *supra,* 365 F.Supp. at 132–33. Although we vacate each of the holdings that support the awards, we believe that the course of this litigation will best be advanced by considering the propriety of the punitive damage award.

We first consider whether this record can support a finding of punitive damages, assuming *arguendo* that Allegheny violated section 404(b). Without any further explanation, the trial judge held: "The Plaintiff, Mr. Nader, is entitled to both compensatory and punitive damages under the antidiscrimination provisions of the Federal Aviation Act of 1958 . . . ." *Id.* at 132. However, we fail to perceive any evidence in the record that could possibly support a verdict for punitive damages on this ground.

 It is a cardinal rule that punitive damages may be awarded to punish a defendant for the outrageous nature of his conduct and to deter the defendant and others from engaging in the same or similar acts. *See, e. g.,* Chesapeake & Potomac Telephone Co. v. Clay, 90 U.S.App.D.C. 206, 194 F.2d 888, 891 (1952); W. Prosser, Law of Torts, *supra,* § 2, at 9–10. As such, mere inadvertence or even gross negligence will not suffice to support an award of punitive damages. *See id.* The tort must be "aggravated by evil motive, actual malice, deliberate violence or oppression." Black v. Sheraton Corp. of America, 47 F.R.D. 263, 271 (D.D.C.1969). Since we

---

45. Transcript, *supra* note 1, at 59.

46. Throughout this litigation, Allegheny has maintained that appellees' action is barred by Allegheny's tariff—Tariff CAB No. 142, Local and Joint Passenger Tariff No. Pr–6, Rule 40(b)—because appellees failed to give written notice of the incident to Allegheny within 45 days of its occurrence. However, private statutes of limitations such as the one before us can be waived by the carrier. *See* United Fruit Co. v. J. A. Folger & Co., 270 F.2d 666 (5th Cir. 1959), cert. denied, 362 U.S. 911, 80 S.Ct. 682, 4 L.Ed.2d 619 (1960). The district court held that Allegheny's denied boarding compensation draft to Nader of $32.41, which if accepted released Allegheny from all claims arising from the incident, and which, on its face, remained open to acceptance for 60 days, constituted a waiver of the 45 day tariff provision. Since Nader brought this suit *within the 60 day period,* we cannot say that the district court's holding was clearly erroneous.

In light of our disposition, we need not pass on the soundness of the district court's other holdings on the tariff issue; nor do we pass upon the tariff's applicability to CCAG as we hold that CCAG cannot recover on the merits.

held earlier that overbooking is not *per se* a violation of section 404(b), but that a violation occurs when an airline disregards its own priority rules, the question becomes whether the nature of Allegheny's conduct in denying Nader a seat on flight 864 contains elements of intentional wrongdoing or conscious disregard for Nader's rights. This question must be answered in the negative.

There is absolutely no evidence that Allegheny refused to board Nader for his activities against airlines or because of any other nefarious reason, nor was Nader treated discourteously. At most, the record reveals a very busy passenger services agent who failed to do all that he could to discover whether every passenger on flight 864 held a confirmed reservation. However, this is not sufficient to award punitive damages. Although Nader contends that the trial judge could have awarded punitive damages because the agent refused "to take reasonable measures, while the plane was still at the gate, to attempt to alleviate the harmful consequences that would befall Mr. Nader and CCAG," Appellee's Br. at 37, we cannot impute any evil or wanton motive to the agent. He testified that he was following his manual which specifically states: "Do not delay the flight seeking a passenger who would be least inconvenienced." App. at 219. While Nader argues that this section of the manual should not have been applied, we have no reason to doubt the agent's good faith in believing that it applied. Moreover, the agent tried to arrange alternative transportation as soon as he realized that flight 864 was oversold.

Nader relies on Wills v. Trans World Airways, Inc., *supra,* to support the argument that punitive damages are appropriate in the case *sub judice.* However, even a cursory examination of *Wills* reveals significant differences that militate against awarding punitive damages on the facts before us. In *Wills,* an economy class passenger was denied a seat so that the airline could accommodate all of its first class passengers. In so doing, the airline knew that it was violating its own priority rules. Moreover, the airline told the passenger that he was being bumped because he had not followed the required procedures for reconfirming his reservation. In fact, he had twice reconfirmed, but the airline's agents made no effort to verify this. Thus, the actions in *Wills* were deliberate and displayed a spirit of malice not evident here.

Nader also argues that punitive damages were awarded in *Wills* because the overbooking was substantial. However, that was only one factor in many that were considered and was merely additional evidence of malice. However, in the case *sub judice,* there is no other evidence of malice. Thus, even if Allegheny's overbooking can be characterized as substantial, there can be no finding of malice without additional aggravating factors.

■ Several recent cases have emphasized the deterrent value of punitive damages; however, they do not explicitly reject the concept that the conduct must be malicious. *See, e. g.,* International Brotherhood of Boilermakers v. Brasswell, 388 F.2d 193 (5th Cir. 1968); Kozar v. Chesapeake & Ohio Railway Co., 320 F.Supp. 355 (W.D.Mich.1970), vacated in part, 449 F.2d 1238 (6th Cir. 1971). If the trial judge's theory was deterrence, that is to force Allegheny to change its boarding or reservation procedures to eliminate denied boarding incidents, then the award cannot stand because it interferes with the primary jurisdiction of the Civil Aeronautics Board. As stated previously, Congress has entrusted the regulation of the airline industry to the Board, and prospective changes in air carrier practices must first be considered by it, subject to judicial review. Significantly, the *Wills* court denied an injunctive remedy against the same practice for which it awarded punitive damages, reasoning that "the Act specifies . . . that a complaint may be brought before the administrative agency, which is duty bound to investigate, and then may issue an

order compelling further compliance with the requirements of the Act." Wills v. Trans World Airways, Inc., *supra,* 200 F.Supp. at 365–66. The district court in Mortimer v. Delta Air Lines, *supra,* was even more explicit. Ruling on a motion to dismiss for lack of jurisdiction, the court stated:

> With respect to punitive damages, the Court will only note at this time that deterring similar acts in the future is of little significance in justifying their award since administrative relief is available to insure that end.

302 F.Supp. at 282. We agree with the *Mortimer* court. As there is no other basis for awarding punitive damages based on Allegheny's violation of section 404(b), the award must be reversed.

We now turn to the award of punitive damages for misrepresentation. The trial judge gave the following reasons for his decision that punitive damages were appropriate:

> Since the Defendant herein intentionally engaged in substantial over-selling, and intentionally did not inform the public of this practice and the attendant risks, and intentionally sought to conceal such information from all its passengers and particularly from the victims of this practice, it is clear that the Defendants [sic] acted not only wantonly but with malice. They are, therefore, liable to both plaintiffs for punitive damages for their misrepresentation.

Nader v. Allegheny Airlines, Inc., *supra,* 365 F.Supp. at 133. It is fundamental that the trier of fact may find malice by drawing inferences from the defendant's conduct. These deductions are findings of fact and are subject to the clearly erroneous standard. However, inferences based on a mistake of fact or of law must be reversed.

Since punitive damages require a finding of malice or reckless disregard for the rights of others, the defendant's motivations are crucial. In the words of the late Dean Prosser: "Still less, of course, can such damages be charged against one who acts under an innocent mistake in engaging in conduct that nevertheless constitutes a tort." W. Prosser, Law of Torts, *supra,* § 2, at 10. However, despite Allegheny's argument to the trial court that an award of punitive damages would be contrary to Board policy because the Board had approved its practices, *see* Defendant's Trial Br. at 4–5, the trial judge never considered whether Allegheny reasonably believed that its policies were completely lawful and in fact carried the approval of the Board. Apparently, the trial judge did not consider this factor because he did not believe that Board involvement was relevant. In finding of fact no. 18, the trial judge stated:

> The Civil Aeronautics Board has not attempted to directly regulate the reservation practices of Allegheny or any other airline . . . CAB regulations specifically contemplate full judicial redress as an alternative means for the vindication of the aggrieved party's rights, at his sole option.

Nader v. Allegheny Airlines, Inc., *supra,* 365 F.Supp. at 131 (citations omitted). Moreover, in finding of fact no. 21, he stated:

> The Defendant Allegheny Airlines . . . is a holder of a certificate of public convenience and necessity. As such it has a public duty and an especially large and high fiduciary obligation to make its policies known to all of its customers with regard to its intentional over-booking.

*Id.* at 132.

In light of the Board's dominant role in determining whether Allegheny's policy of nondisclosure is or is not deceptive, and its continued exercise of jurisdiction to control the carriers' overbooking practices, we think that finding no. 18 is clearly erroneous. Also, we cannot accept the notion that air carriers *ipso facto* become fiduciaries and are held to a standard of full disclosure to the public merely because they possess a certificate of public convenience and necessity. While special obligations are sometimes imposed upon common carriers, the trial court offered no support for

its interpretation of the scope of a certificate. If Congress had intended to import such significant extra duties to the carriers, some glimmer of its intent should be found in the statute or the legislative history. However, we have been unable to find such a message. *See* United States v. Bradley, 252 F.Supp. 804 (S.D.Tex.1966).

In short, on remand, if Allegheny's practices are found to be deceptive, and a judgment is entered against it, the trial judge must consider whether Allegheny had a good faith defense. Moreover, in drawing inferences from Allegheny's failure to disclose its policies, the trial judge cannot view Allegheny as a fiduciary.

## V. CONCLUSION

For the reasons stated in part III of this opinion:

(1) the judgment entered in favor of Nader based on Allegheny's alleged violation of section 404(b) is reversed, and the district court is instructed to make new findings of fact and conclusions of law in accordance with this opinion. In addition, the district court may take appropriate action to resolve conflicts in the evidence;

(2) the judgment in favor of CCAG based on fraudulent misrepresentation is reversed, and the district court is instructed to enter a judgment in favor of Allegheny on this issue; and

(3) the judgment entered in favor of Nader based on fraudulent misrepresentation is reversed, and the district court is instructed to stay further action on this issue in accordance with this opinion.

For the reasons stated in part IV of this opinion:

(1) the punitive damage award to Nader and CCAG is reversed. Punitive damages shall be awarded only on the terms set forth in this opinion.

So ordered.

FAHY, Senior Circuit Judge (concurring in part, dissenting in part):

I concur in the conclusion reached in the opinion of Judge Tamm for the court that the question whether appellee Nader was entitled to recover under section 404(b) of the Federal Aviation Act must be remanded for further consideration. I also concur in the conclusion of the court, assuming *arguendo* that Allegheny committed fraudulent misrepresentation, that appellee Connecticut Citizen Action Group (CCAG) is not within the class which can recover on that ground. Furthermore, I concur that punitive damages may not be awarded on the present record for a section 404(b) violation.

My dissent is due to the court's disposition of the claim of Mr. Nader based on allegedly fraudulent misrepresentation by Allegheny. The court holds that the finding of the District Court in that regard must be reversed and the case stayed until the Board determines whether the reservation practices of the airlines are deceptive. In my opinion the finding by the District Court of fraudulent misrepresentation is ripe for review now by this court without reference to the Board, under section 411, of the reservation practices of the airlines. That section, entitled "Methods of Competition", provides as follows:

The Board may, upon its own initiative or upon complaint by any air carrier, foreign air carrier, or ticket agent, if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier, foreign air carrier, or ticket agent has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof. If the Board shall find, after notice and hearing, that such air carrier, foreign air carrier, or ticket agent is engaged in such unfair or deceptive practices or unfair methods of competition, it shall order such air carrier, foreign air carrier, or ticket agent to cease and desist from such practices or methods of competition. (Pub.L. 85–726, title IV, § 411, Aug. 23, 1958, 72 Stat. 769.)

The authority thus granted the Board looks only to the future cessation of practices determined by the Board to be

unfair or deceptive. It does not either provide or preclude a remedy for past tortious conduct of a carrier injurious to an individual. Moreover, section 1106 of the Act provides:

Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

Pub.L. 85–726, title XI, § 1106, Aug. 23, 1958, 72 Stat. 798. 49 U.S.C. § 1506.

Yet our court now holds,

if the Board properly finds that a practice is not deceptive, a common law action for misrepresentation must fail as a matter of law.

I assume the court, by the language "properly finds", means finds in a manner which would meet judicial approval on review of such a finding made in the exercise of the Board's power under section 411, without such power being conditioned by the common law or section 1106 of the Act. I so assume because it is clear the court now vests the Board with decisional authority to determine that an individual who has suffered injury due to a carrier's fraudulent misrepresentation, and who otherwise would have a common law remedy, would have no such remedy should the Board determine the conduct was not deceptive. This position of the court that if the Board in a section 411 proceeding determines that a practice is non-deceptive then a common law action for fraudulent misrepresentation must fail as a matter of law seems to me to nullify section 1106. Moreover, the court thus divests itself not only of the authority to adjudicate a claim of fraudulent misrepresentation but also vests the Board with authority to define fraudulent misrepresentation in a manner which the courts must accept for the airline industry. I do not find that Congress has so provided or intended. Indeed, section 1106 seems to me clearly to the contrary. Section 411 affords, or denies, only a statutory remedy, unknown to the common law.

The court well describes the problem facing the airlines due to persons with reservations failing to "show". This problem continues to be of deep concern to the industry and to the Board. It is the subject now of some regulation and further regulation is under consideration.[1] Clearly the matter is appropriate for such consideration and possibly additional regulation under section 411 and perhaps under other provisions of the Act. My disagreement with the Board and my colleagues is that the Act nevertheless falls short of eliminating judicial determination whether a particular factual situation such as now before us amounted to fraudulent misrepresentation.

If the present question were whether the bumping of Mr. Nader constituted a deceptive practice within the meaning of the Act, I would agree the matter would of course be within the primary jurisdiction of the Board. If, however, as I see it, the question now is whether he was the victim of fraudulent misrepresentation—a common law tort—it is for the court alone to decide. *Cf.,* Great Northern Ry. Co. v. Merchants Elevator Co., 259 U.S. 285, 290–91, 42 S.Ct. 477, 66 L.Ed. 943 (1922), opinion by Brandeis, J.; Holloway v. Bristol-Myers Corporation, 158 U.S.App.D.C. 207, 485 F.2d 986, 989 (1973). Whatever this court should decide as to the claim of fraudulent misrepresentation—whether for or against Nader—the Board would be free to exercise its statutory authority. Thus, the respective jurisdiction of court and Board overlap;[2] but where there is

---

1. As pointed out by Judge Tamm the Board presently has the matter under consideration in Docket 26253, Emergency Reservation Practices Investigation. 39 Fed.Reg. 823 (1974).

2. As this court stated in *Holloway, supra,* at 989, with respect to the Federal Trade Commission Act, so here, "Congress has superimposed a structure of Federal law upon the existing system of common law remedies for fraud and deceit without preempting or superseding the latter."

presented a claim of common law tort liability, as now, the jurisdiction of the court for its determination is independent of that of the Board.

Bumping may not be *per se* a deceptive practice. Moreover, it may not be the result of fraudulent misrepresentation, but when in a particular instance it is claimed to have been due to the latter the question is for the court to decide, though hopefully the need for resort to the court will be obviated when the practice is regulated not inconsistent with my position.

Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 446, 27 S.Ct. 350, 51 L.Ed. 553 (1907), I think fails to support the court. In construing the Interstate Commerce Act, which lodged in the Interstate Commerce Commission decisional responsibility for the reasonableness of filed rates, the Court held that this purpose of the Act would be destroyed if a statutory reservation of a common law remedy were construed to vest this very question of reasonableness of rates in the courts independently of the Commission. In so holding, the Court emphasized the importance of preserving common law remedies, and explained its decision as follows:

> . . . we must be guided by the principle that repeals by implication are not favored, and indeed that a statute will not be construed as taking away a common law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory.

*Id.* at 437, 27 S.Ct. at 354.[3] The statute we now construe sets forth no specific

conduct which is to be protected or prohibited by the Board under section 411.

There is no denying the broad scope accorded the expertise of regulatory agencies by the Supreme Court, especially where, as in the present case, the agency has been granted by Congress regulatory authority over a particular industry. Practices which would be held to offend another statute, such as the Sherman Act, have been permitted when approved in the public interest by the agency regulating the industry. Illustrative is Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952). The case involved a Conference Agreement of steamship companies, approved by the United States Shipping Board under statutory authority. The question was whether a dual system of rates violated the Sherman Act, as the United States contended. The Court held the matter must be passed upon by the Federal Maritime Board before being decided by a District Court, describing the issue as the relation of the Sherman Act to the Shipping Act. Adhering to its previous analysis in United States Navigation Co., Inc. v. Cunard Steamship Co. Ltd., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932), of the powers entrusted by Congress to the United States Shipping Board under the Shipping Act, the Court said it was "now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far Eastern Conference, supra,* 342 U.S. at 574, 72 S.Ct. at 494.

If we transpose it from its own context to that of the present case, the above language would arguably support the court's position except that the subject of fraudulent misrepresentation is

---

3. See, also, Bell Telephone Company of Pennsylvania v. F. C. C., 503 F.2d 1250, 1280 (3d Cir. 1974), where the court notes:

> We have recognized that "a statute should not be considered in derogation of the common law unless it expressly so states or the result is imperatively required

from the nature of the enactment." Bauers v. Heisel, 361 F.2d 581, 587 (3d Cir. 1966) (en banc), cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457, . . . *see also* Texas & Pacific Ry. v. Abilene Cotton Oil Co. . . . ..

within the conventional experience of judges. For other reasons I do not believe the situation we face justifies such transposition. Congress has expressly limited the present Board's authority by preserving common law remedies. In addition, the Supreme Court, in its recognition of the great public interest served by administrative law has never gone so far as to import into agency regulatory authority the right to approve a tortious injury to an individual, quite a different matter from exempting an industry from statutory accountability under the antitrust laws for conduct approved in the public interest under authority expressly granted by Congress.

Even where the present Board, under section 414 of the Act, 49 U.S.C. § 1384, is authorized to immunize from the antitrust laws conduct which it has approved in the public interest under other sections of the Act, as in *Far Eastern Conference, supra,* conduct which violates those laws but which has not been approved under the Act, is not exempted from their application. Aloha Airlines, Inc. v. Hawaiian Airlines, Inc., 489 F.2d 203 (9th Cir. 1973), rehearing denied, January 29, 1974. There the court, opinion by Tuttle, J., distinguished Hughes Tool Co. v. Trans World Airlines, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) and Pan American World Airways v. United States, 371 U.S. 296, 305, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), where antitrust problems "expressly entrusted to the CAB [the Board] are withdrawn from consideration by the Courts." The court reasoned as follows:

> In the case before us there is no order of the CAB authorizing the conduct which has been made the basis of the antitrust complaint filed by Aloha [Airlines]. HAL [Hawaiian Airlines] takes the position, however, that the fact that section 411 of the Act provides that the Board may, upon its own initiative or upon complaint by any air carrier, investigate and determine whether any air carrier has been or is engaged in unfair or deceptive practices or unfair methods of compe-

tition in air transportation and if it should find the existence of such practices, it shall issue a cease and desist order amounts to an explicit commitment of exclusive authority to the Board to deal in all aspects with charges of unfair competition.

> To be sure, *Pan American* [371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325] held that the CAB had exclusive jurisdiction to halt certain alleged anticompetitive practices, but the alleged practices in that case had been the subject of specific orders of the CAB dealing with "the division of territories or the allocation of routes or . . . combinations between common carriers and air carriers"—all matters within the Board's primary jurisdiction under section 408 or section 409. In contrast, the CAB has not issued any orders authorizing or restraining HAL's past conduct of which Aloha complains.

> The Court made it plain in *Pan American* that such jurisdiction was restricted to prospective relief since the Court said "[t]he Board has no power to award damages or to bring criminal prosecutions." This was noted at the point in which the Court was recognizing limitation on the kinds of relief that were committed to the Board. The dissenting opinion by Mr. Justice Brennan was based ·largely upon the distinction made by the Court between the granting of exclusive jurisdiction to the Board as to injunctive matters while leaving to the antitrust court the handling of damage claims.

> We conclude, therefore, that the grant of authority to the Board by section 411 does not withdraw from the antitrust litigants the right to proceed for damages alleged to have occurred by reason of antitrust violations of the kind with which the Board has authority to deal only by issuing a cease and desist order.

489 F.2d at 208.

By comparable reasoning, section 411 does not withdraw from appellee Nader

the right to sue for damages alleged to have occurred by reason of common law fraudulent misrepresentation.[4]

The court refers also to American Airlines Inc. v. North American Airlines, Inc., 351 U.S. 79, 76 S.Ct. 600, 100 L.Ed. 953 (1956). The case arose in a proceeding by the Board itself under section 411 to require North American Airlines to cease and desist from using "North American" in its name in competition with the previously licensed American Airlines. No claim by American of a common law wrong or remedy was involved. In its opinion the Supreme Court pointed out that section 411 was modeled after section 5 of the Federal Trade Commission Act. We had stated in *Holloway, supra,* that the remedies of section 5 were additional to rather than in derogation of the common law remedies for fraud and deceit:

> This Act [the Federal Trade Commission Act] does not purport to affect a consumer's right to obtain damages in a common law action sounding in fraud or deceit, or in any expansion of that action that may evolve in common law jurisprudence.

485 F.2d at 999. The Supreme Court in *American Airlines,* however, observed that section 5 of the Trade Commission Act was "concerned with purely private business enterprises," and differed from a statute where, as in our case, Congress has committed the regulation of a particular industry to an agency of special competence to deal only with that industry's problems. Our court now reasons from this difference that the common law remedies for fraud and deceit cannot remain totally unaffected by section 411. I agree to the extent that the Board may add to common law remedies, and require a carrier to cease and desist unfair and deceptive practices, as in *American Airlines,* but I find no support in

that case for a view that the Board has power to eliminate a common law private action for fraudulent misrepresentation by deciding that past conduct of that character by an airline in a particular case was not a deceptive practice.

I do not intimate that should the court sustain the finding of the District Court of fraudulent misrepresentation the punitive damages awarded by the District Court would also be sustained.

I respectfully dissent from that part of the decision of the court which defers decision of the Nader claim of fraudulent misrepresentation to await Board determination whether the reservation practices of the airlines are deceptive.[5]

---

4. I think this would be so even if the Board had previously approved bumping as not *per se* deceptive. The present case must rest upon its particular facts on the issue of fraudulent misrepresentation.

5. It is not clear to me that increased passenger fares need follow from the position I hold,

even should it result in some readjustment within the over-all economics of the industry operating free of fraudulent misrepresentation. Moreover, I am unable legally to justify barring the courts from according a remedy for injury found after fairly conducted judicial proceedings to have resulted from the fraudulent misrepresentation of an airline.